Ex parte Philip Daniel TAYLOR,
Appellant.

No. 652–00.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 6, 2002.

Brian W. Wice, Houston, for appellant.

Jeffrey L. Van Horn, First Asst. St. Atty., Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, JOHNSON and HOLCOMB, J.J., joined.

Appellant lost control of his car on a rural road and collided with an oncoming car. Appellant's two passengers died in the accident. A jury acquitted appellant of intoxication manslaughter in causing the death of one passenger. The State had alleged that appellant was intoxicated by alcohol. The State now seeks to prosecute appellant for intoxication manslaughter in causing the death of his second passenger. This time, however, the State alleges that appellant was intoxicated by either alcohol *and* marijuana or by marijuana alone. We must determine whether the appellant's acquittal in the first trial, of intoxication manslaughter, prevents the State from attempting to prove, in another criminal proceeding, an alternate theory of intoxication for causing the death of his second passenger.[1] The Fourteenth Court of Appeals held that collateral estoppel barred the State from relitigating the ultimate issue—intoxication—regardless of whether the State alleged a different *type* of intoxicant. *Taylor v. State*, No. 14–99–00399–CR, 2000 WL 19151 (Tex.App.-Houston [14th Dist.] 2000) (not designated for publication). We

agree. Because of the particular pleadings, evidence, charge, arguments of counsel, and jury verdict in this case, we find that collateral estoppel applies to the ultimate issue of intoxication. Therefore, we affirm the court of appeals' decision.

### I.

A Brazos County grand jury returned three indictments against appellant relating to a two-car accident that occurred on May 26, 1996. Appellant's two passengers, Michelle James and Kyla Blaisdell, both died, and the other driver, Patricia Varner, sustained serious injuries. The separate indictments for the deaths of Ms. James and Ms. Blaisdell each charged two counts of intoxication manslaughter[2] and one count of manslaughter in which the State alleged that appellant recklessly drove at an excessive speed into another vehicle. The third indictment charged appellant with intoxication assault and aggravated assault against Ms. Varner. At appellant's request, the trial judge severed the three indictments, and a jury trial proceeded on the manslaughter counts for causing the death of Michelle James.

The evidence showed that appellant was driving his Ford Thunderbird on a rural road in Brazos County late one afternoon. His fiancee, Kyla Blaisdell, sat in the front passenger seat and her best friend, Mi-

---

1. Specifically, we granted the following grounds for review:
 1) Where a jury returns a verdict of not guilty, necessarily based upon a negative finding regarding a specifically alleged manner or means of proving an ultimate issue, is the State precluded from relitigating the same ultimate issue, based upon a different manner or means, in a subsequent proceeding between the same parties?
 2) Does a jury verdict of not guilty in an intoxication manslaughter prosecution, necessarily based upon a negative finding regarding intoxication by alcohol, pre-

 clude the State from relitigating the issue of intoxication by alcohol and marijuana in a subsequent prosecution for intoxication manslaughter between the same parties?

2. Each indictment alleged that appellant had operated a motor vehicle while intoxicated by
 1) not having the normal use of his mental and physical faculties by reason of the introduction of alcohol into his body; and
 2) having an alcohol concentration of .10 or more.

chelle James, sat in the back seat. It was not disputed that appellant was speeding, but witnesses' estimates of his actual speed varied widely.[3] As appellant came out of a curve, the Thunderbird's right front wheel left the paved surface and veered onto a grassy, gravely area. According to the defense expert, appellant overcorrected as he attempted to bring his front wheel back onto the pavement. Consequently, he lost control of the car, which veered into the left lane and collided with Ms. Varner's oncoming Suburban. According to the State's expert, appellant lost control of the car as he entered the curve at a high speed. Because of his speeding through the curve, the car headed into a ditch on the right hand side, and appellant pulled the steering wheel too much to the left, sending the car into the left lane. Regardless of where appellant lost control of the car, Kyla Blaisdell and Michelle James died in the collision. Ms. Varner and appellant were both seriously injured.

At the hospital, medical technicians drew a sample of appellant's blood to determine its blood alcohol concentration ("BAC"). Their analysis resulted in a .137 BAC reading. The DPS twice reanalyzed this blood sample, using more sensitive equipment. Its analysis returned BAC readings of .124 and .119. DPS took another blood sample from appellant more than three hours after the first sample. This second sample indicated a BAC of .06. Appellant's blood also tested positive for the presence of marijuana, but there was

no evidence that he had smoked marijuana on that particular day. The prosecutor, agreeing that traces of marijuana may linger in the body for days after its actual use, did not oppose appellant's motion in limine barring any mention of marijuana during the trial. Kyla Blaisdell tested negative for both alcohol and drugs; Michelle James tested negative for drugs, but .04 for alcohol; and Ms. Varner tested negative for both drugs and alcohol. Appellant's toxicology expert testified that, according to his calculations, appellant's BAC at the time of the accident must have been between .07 and .09.

Kelsey Blaisdell, Kyla's brother, testified that the trio spent most of the afternoon at his parent's home. He said that they came over to do laundry and to "hang out." They had some wine with them and were drinking from about 2:30 until 6:00 p.m. Kelsey testified that appellant did not seem drunk or otherwise intoxicated: appellant did not slur his speech or have poor balance. According to Kelsey, appellant didn't exhibit any of the characteristics of an intoxicated person. Kelsey stated: "I didn't feel that he was intoxicated at all." Although Kelsey admitted that, on the night of the accident, he had told a police officer he had "a strong suspicion [appellant] was driving while intoxicated," Kelsey explained that he had said that simply because appellant and the girls had been drinking.

**3.** Cara Clank, a State's witness, testified that the posted speed on that section of road is 50 m.p.h. She testified that there was a warning sign posted in advance of the curve where the accident occurred. This sign advised drivers to slow to 40–45 m.p.h. She stated that, when appellant passed her, before the curve, he was going about 90 m.p.h. A Department of Public Safety (DPS) Trooper testified that, according to the DPS's original accident reconstruction figures, appellant was driving approximately 87 m.p.h. when he lost control of his car on or immediately after the curve. Ten days before trial, however, the DPS revised its original calculations downward by 20 m.p.h., determining that appellant was driving at about 69 m.p.h. Appellant's own accident reconstruction expert estimated that appellant was going 60 m.p.h. as he left the curve. Both experts concluded that appellant's speed at impact was between 58–60 m.p.h.

At the conclusion of all evidence, the trial judge charged the jury that, if it believed from the evidence, beyond a reasonable doubt, that appellant:

did operate a motor vehicle in a public place while intoxicated, either by not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body or by having an alcohol concentration of .10 or more, and by reason of that intoxication, if any, by accident or mistake, caused the death of Michelle James, you will find [appellant] guilty of intoxication manslaughter.

The jury was also instructed, as an alternate basis for a finding of guilt, that if it believed from the evidence, beyond a reasonable doubt, that appellant:

did recklessly cause the death of Michelle James by operating a motor vehicle at an excessive speed and by driving into a motor vehicle occupied by Patricia Varner, you will find [appellant] guilty of manslaughter.

In its closing argument, the State argued that appellant "caused the deaths of Kyla Blaisdell and Michelle James because he chose to drink and drive that day." The State then reviewed the evidence showing that appellant was speeding and driving recklessly; that he had lost the normal use of his mental and physical faculties because of alcohol; and that he was per se intoxicated, as demonstrated by his BAC levels both immediately after he arrived at the hospital and as extrapolated from the DPS test taken more than three hours later.

The defense argued, on the other hand, that appellant had been drinking, but that he was not intoxicated. The defense challenged the accuracy of the first blood test and the relevancy of the second. The defense argued that, although appellant was speeding, he had his car under control when he completed the curve. According to defense counsel, "something" happened as appellant started to accelerate on the straightaway—he looked away, an animal darted out, he was startled by something—and his right front wheel went slightly off the road. He overcorrected and the car veered left. In sum, according to the defense, this was a tragic and horrible accident, but not a crime.

■ The jury acquitted appellant of all counts of intoxication manslaughter and reckless manslaughter of Michelle James. The State subsequently dismissed appellant's indictment for causing Kyla Blaisdell's death. But later the State learned that appellant, sometime after the trial, allegedly told Kyla Blaisdell's mother that he and the girls had been smoking marijuana cigarettes on the afternoon of the accident.[4] Based upon this newly discovered evidence, the State re-indicted appellant for intoxication manslaughter in causing the death of Kyla Blaisdell, alleging that he had lost the normal use of his mental and physical faculties by reason of the introduction of alcohol, marijuana, or a combination of alcohol and marijuana.[5]

---

4. Appellant's attorney stated on the record that appellant, if called to testify, would deny making that statement to Mrs. Blaisdell.

5. Double jeopardy prevents *any* reprosecution of appellant for manslaughter in causing the death of Michelle James. *See Ball v. United States,* 163 U.S. 662, 671, 16 S.Ct. 1192, 41 L.Ed. 300 (1896) (when a jury in a criminal case has returned a verdict of not guilty, the double jeopardy prohibition bars further prosecution of that defendant for the same offense); *see also United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978) (holding that a jury verdict of not guilty terminates the prosecution of that offense); *Ex parte Rhodes,* 974 S.W.2d 735, 738 (Tex.Crim.App.1998).

Appellant filed an application for a pretrial writ of habeas corpus, contending that the doctrine of collateral estoppel barred any further State efforts to prosecute him for causing this accident based upon his alleged intoxication. The trial court largely denied appellant relief, concluding that only the issue of intoxication *by reason of alcohol* had been litigated in the first trial, but not the distinct factual question of whether marijuana, either alone or in combination with alcohol, had rendered him intoxicated. Appellant then filed a pretrial appeal under Tex.R.App. P. 31 to the Fourteenth Court of Appeals, which disagreed with the trial court and granted full habeas relief. It concluded that the ultimate issue of fact decided by the jury was that appellant was not intoxicated; therefore, the issue of intoxication could not be relitigated in any further criminal proceeding:

> Multiple substances that cause a person to become intoxicated (e.g., alcohol ingestion and controlled substance ingestion) are not distinct elements of separate intoxication manslaughter offenses; rather such sources of intoxication are merely evidentiary and do not concern the manner in which the offense was committed.[6]

After deciding that the State Prosecuting Attorney has primary authority for filing petitions for discretionary review,[7] we granted the State Prosecuting Attorney's petition to review the correctness of the court of appeals' holding.

## II.

At issue in this appeal is the scope of the factual finding that the jury made when it acquitted appellant. The State assumes that the first jury concluded that appellant was not intoxicated because of alcohol.[8] It contends that this finding does not preclude the State from prosecuting appellant for the death of a second accident victim, when the State alleged intoxication by alcohol *and* marijuana *or* by marijuana alone:

> Where an individual is tried for an offense based upon a statute that contains an element that is susceptible of proof by multiple manners or means, does the jury's negative finding regarding the particular manner or means alleged to establish the general element extend to any manner or means that could establish the general element, or does it extend only to the particular manner or means that was charged to the jury?

The State poses the issue as this: if a jury acquits a defendant of committing an offense in one manner and means, does its factual finding preclude the State from relitigating the commission of the same statutory offense against a different victim by a different manner and means? But that is not really the issue. The doctrine of collateral estoppel does not depend upon slight differences in statutory language or an alternate "manner and means"; it depends upon the scope of a specific factual finding in a particular case. There is no "bright-letter" or "black-letter" law which can resolve that question in all cases.[9]

6. *Taylor,* slip op. at 9.

7. *Ex parte Taylor,* 36 S.W.3d 883, 887 (Tex. Crim.App.2001).

8. The State Prosecuting Attorney states: "While the State remains less than convinced that the jury's not guilty verdict was necessarily due to a factual conclusion that the appellant was not intoxicated, as alleged, we will assume such to be true for the purposes of the issues presented in this case."

9. "[C]ase[s] involving the arcane principles of double jeopardy and collateral estoppel [are] not susceptible of bright-letter law or black-letter law; the areas are most often gray and dimly to be seen. Needless to say, one entering this field must do so with trepidation."

■ The first prosecution was for killing Michelle James; the second, for killing Kyla Blaisdell. For double jeopardy purposes, the unlawful killing of each victim is a separate offense.[10] In its seminal case on collateral estoppel, *Ashe v. Swenson*,[11] the Supreme Court noted that the defendant's reprosecution was not barred by double jeopardy under the usual *Blockburger*[12] test because the second prosecution was for a different offense, namely the robbery of a different victim attending the same poker party.[13] Thus, the Supreme Court had to turn to the related doctrine of collateral estoppel, which prevents a party who lost a fact issue in the trial of one cause of action from relitigating the same fact issue in *another* cause of action against the same party.[14] The situation is the same in this case. If the State had prosecuted appellant for the same offense (causing the death of Michelle James) on a different theory, we would not have to resort to collateral estoppel. Reprosecution would be barred by *autrefois acquit*[15] under *Blockburger*.

## A. The doctrine of collateral estoppel.

■ In *Ashe v. Swenson*, the Supreme Court stated that collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."[16] To determine whether collateral estoppel bars a subsequent prosecution (or permits prosecution but bars relitigation of certain specific facts) courts employ a two-step analysis. Courts must determine:

(1) exactly what facts were "necessarily decided" in the first proceeding; and

(2) whether those "necessarily decided" facts constitute essential elements of the offense in the second trial.[17]

---

*United States v. Larkin*, 605 F.2d 1360, 1361 (5th Cir.1979), *modified on other grounds*, 611 F.2d 585 (5th Cir.1980).

**10.** "[I]n Texas, the allowable unit of prosecution for an assaultive offense is each victim." *Ex parte Hawkins*, 6 S.W.3d 554, 560 (Tex. Crim.App.1999).

**11.** 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

**12.** *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**13.** *Ashe v. Swenson*, 397 U.S. at 438, 90 S.Ct. 1189.

**14.** *Id.* at 443, 90 S.Ct. 1189.

**15.** "*Autrefois acquit:* a plea in bar of arraignment that the defendant has already been acquitted of the offense." BLACK's LAW DICTIONARY 104 (7th ed.2000).

**16.** *Ashe v. Swenson*, 397 U.S. at 443, 90 S.Ct. 1189.

**17.** *Neal v. Cain*, 141 F.3d 207, 210 (5th Cir. 1998); *see also Dedrick v. State*, 623 S.W.2d 332, 336 (Tex.Crim.App.1981) (quoting *United States v. Mock*, 604 F.2d 341, 343 (5th Cir. 1979)).

The dissent suggests that the constitutional doctrine of collateral estoppel as set out in *Ashe v. Swenson* no longer applies to a general "not guilty" verdict. Post, Op. at 447 n. 3. Under the dissent's reasoning, collateral estoppel would never apply to the guilt stage of any Texas criminal case because article 37.07, § 1(a) requires that all verdicts in Texas criminal trials be general verdicts.

The dissent relies upon selected quotes from *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) for that position. But in *Watts*, the Supreme Court simply held that, for purposes of the federal sentencing guidelines, a district court could consider evidence of conduct for which the defendant had been acquitted because the burden of proof at the sentencing stage of a federal criminal proceeding is normally only by a preponderance of evidence. *Id.* at 156, 117 S.Ct. 633 (noting that "[f]or these reasons, 'an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof' "). Thus, said the Supreme Court:

In each case, courts must review the entire trial record to determine—"with realism and rationality"—precisely what fact or combination of facts the jury necessarily decided and which will then bar their relitigation in a second criminal trial.[18] In *Ashe v. Swenson,* the Supreme Court emphasized that:

> the rule of collateral estoppel is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality.... The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment

was based upon a general verdict of acquittal.[19]

■■ Although Texas courts have rarely discussed the scope of a fact barred by collateral estoppel, cases from other jurisdictions have held that collateral estoppel operates only if the "very fact or point now in issue" was determined in the prior proceeding.[20] It must be "precisely" the same issue in both cases.[21] Thus, issue preclusion "is limited to cases where the legal and factual situations are identical."[22] Collateral estoppel may "apply to a phase, an issue of fact, or congeries of fact,"[23] depending upon the particular circumstances.

■ On the other hand, issue preclusion cannot be defeated simply by advancing new or different evidence to support the same issue already litigated.[24] Thus, a party who neglects to submit the evidence

We therefore hold that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proven by a preponderance of the evidence.
*Id.* at 156, 117 S.Ct. 633. It is well-established that collateral estoppel does not bar relitigation of facts when the standard of proof in the second proceeding is lower than in the first. *See Dowling v. United States,* 493 U.S. 342, 349, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 361, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984). In this case, for example, relitigation of appellant's intoxication would not be barred in a civil suit brought by the deceaseds' families because the burden of proof in a civil suit is only by a preponderance of the evidence.

**18.** *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189.

**19.** *Id.* (citations omitted).

**20.** *Brubaker v. King,* 505 F.2d 534, 538 (7th Cir.1974); *see also State v. Nash,* 817 S.W.2d 837, 840 (Tex.App.-Amarillo 1991, pet. ref'd).

**21.** *Goodson v. McDonough Power Equip., Inc.,* 2 Ohio St.3d 193, 2 OBR 732, 443 N.E.2d

978, 983 (1983). As explained in *Overseas Motors, Inc. v. Import Motors Ltd.:*

> "An issue is a single, certain and material point arising out of the allegations and contentions of the parties." It may concern only the existence or non-existence of certain facts, or it may concern the legal significance of those facts. If the issues are "merely evidentiary," they need only deal with the same past events to be considered identical. However, if they concern the legal significance of those facts, the legal standards to be applied must also be identical; different legal standards as applied to the same set of facts create different issues.

375 F.Supp. 499, 518 n. 66a (E.D.Mich.1974) (citations omitted), *aff'd,* 519 F.2d 119 (6th Cir.1975).

**22.** *Steel v. United States,* 813 F.2d 1545, 1550 (9th Cir.1987).

**23.** *United States v. Larkin,* 605 F.2d 1360, 1369 (5th Cir.1979), *modified on other grounds at* 611 F.2d 585 (5th Cir.1980).

**24.** *See* 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD N. COOPER, FEDERAL PRACTICE & PROCEDURE § 4417 at 446 n. 45 (2d ed.2000).

that would support a legal theory that the party withheld in a first proceeding, cannot later point to its own omission as justification for pursuing a second proceeding.[25]

In sum, there are no hard and fast rules concerning which factual issues are legally identical and thus barred from relitigation in a second criminal proceeding. As Professor Wright concludes: "If an ordinary person would expostulate, 'But that's a different issue,' probably it is." [26]

In each case, the entire record—including the evidence, pleadings, charge, jury arguments, and any other pertinent material—must be examined to determine precisely the scope of the jury's factual findings. In one case, for example, a jury's acquittal might rest upon the proposition that the defendant was "not intoxicated," while in another, that same verdict might rest upon the narrower proposition that the defendant was "not intoxicated" by a particular substance, but he might well have been intoxicated by a different substance. Generally, then, the scope of the facts that were actually litigated determines the scope of the factual finding covered by collateral estoppel.

## B. Collateral estoppel applied to this trial.

Given the pleadings, the jury charge, the disputed issues, and the evidence presented by both the State and the defense at the trial, the jury in this particular case necessarily concluded that, at the time of the accident:

1) Appellant had not lost the normal use of his mental or physical faculties by reason of the introduction of alcohol;

2) Appellant did not have an alcohol concentration of .10 or more; and

3) Appellant did not recklessly drive at an excessive speed into another vehicle.

Thus, these three facts have been established, and they cannot be relitigated in any future criminal proceeding against appellant. But do these discrete factual findings leave open the possibility that appellant *was* intoxicated, but by some substance other than alcohol?

---

**25.** *See Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 903 F.2d 445, 456 (7th Cir.1990); *see also* 18 WRIGHT, MILLER & COOPER, *supra* note 17, § 4417 at 431. As noted by Professor Wright, the purposes of issue preclusion are commonly thought to extend beyond the minimum of the "red light/green light" fact:

> [T]he plaintiff who failed to prove the light was red is apt to be held precluded not only as to the color of the light but also as to the "issue" of negligence. Efforts to show that the driver was going too fast, failed to keep a proper lookout, or swerved into the wrong lane of traffic will be precluded even though none of these matters were raised in the first action.

*Id.* (citing RESTATEMENT SECOND OF JUDGMENTS, § 27, illus. 4 (1981)). Professor Wright was speaking of the application of issue preclusion in civil cases, but the basic rationale for this position frequently applies to criminal proceedings as well:

> Narrower definitions of the issues resolved augments the risk of apparently inconsistent result, invites complete relitigation of facts once tried in order to evaluate the new evidence accurately and threatens the reliance or instinctive sense of repose that many litigants are apt to indulge without pausing for sophisticated assessment of the issues resolved.

*Id.* at 431–32. On the other hand, an overly expansive application of issue preclusion would bar litigation of factual matters "without any pretense that they have been litigated and resolved in a prior action." *Id.* at 432. Thus, "it may prove best to find that identical issues are involved only on a strong showing that relitigation would present matters that clearly bore on ultimate issues that were raised in the first action. . . ." *Id.*

**26.** 18 WRIGHT, MILLER & COOPER, *supra* note 24 § 4417 at 440.

Not here. The only witness who testified to appellant's possible loss of normal use of mental or physical faculties was Kelsey Blaisdell, the brother of one of the victims. He stated that appellant and the two girls had some wine that afternoon. They arrived with a "box" of wine and the three of them drank from it for about three hours. Nonetheless, appellant didn't seem drunk or intoxicated. He did not slur his speech or have poor balance. He did not "noticeably" exhibit any of the characteristics of an intoxicated person. Kelsey testified that, "I didn't feel he was intoxicated at all.... I knew he had been drinking" but appellant seemed perfectly normal to him. Because the trial court granted appellant's unopposed motion in limine, there was no mention at trial of any other possible source of intoxication and no other evidence that appellant had lost the normal use of his mental or physical faculties.[27]

The *source* of appellant's intoxication was not a disputed issue in the first trial. It was only the more general issue of intoxication was he or wasn't he that was disputed, and upon this issue, the appellant prevailed. Had appellant's defense been one of conceding the *fact* of intoxication, but contesting the *manner* in which he became intoxicated, the situation would, of course, be different.

 Thus, considering the question in a practical, common-sense manner, it is evident that there is no reasonable possibility that the jury in the first trial could have decided, based upon this evidence, that appellant *was* intoxicated but not because of alcohol. The court of appeals, in its review, concluded that "[i]mplicit in the jury's verdict is a factual finding that Appellant did not cause the automobile accident because of intoxication."[28] We have not found any evidence in the trial record to contradict this conclusion, nor has the State shown any such evidence.[29]

27. Of course, from the fact of appellant's drinking, a reasonable jury could have inferred that appellant was intoxicated, and it could have further inferred that such intoxication was the cause of the accident, but this jury specifically rejected that chain of logic. We are not free to second-guess it.

28. *Taylor,* slip op. at 8. The court of appeals explicitly rejected the State's suggestion that the jury in the first trial could have believed that Appellant did not have the normal use of his mental or physical faculties at the time of the accident by reason on intoxication but nevertheless acquitted him because it found that such intoxication was not due to alcohol. "Though ingenious, the argument fails. Stated otherwise, it is the State's contention that one of the issues of ultimate fact litigated in Appellant's first trial was the *source* of his alleged intoxication. Such is not the case." *Taylor,* slip op. at 9.

29. The dissent argues that the jury could have decided that appellant was, in fact, intoxicated but that "his intoxication was not a contributing factor to the accident." Post, Op. at 447. This is, of course, a possibility, but that

factual finding would not prevent the application of collateral estoppel. Quite the reverse. Under such a factual finding, it would not matter in the slightest what substance caused the intoxication; whatever the substance, intoxication itself was not a contributing factor to the accident. If *that* were the fact that the jury necessarily decided, then collateral estoppel would apply to causation, rather than intoxication. Causation, in this case, is a broader fact than intoxication, but the State would still be collaterally estopped from relitigating the factual issue of whether intoxication (whatever the intoxicant) was a contributing factor to the accident. In either scenario, the fact or "congeries of fact" necessarily decided by the first jury preclude relitigation of the issue of intoxication. *See United States v. Larkin,* 605 F.2d at 1369–1370 (noting that collateral estoppel may apply to more than one fact or issue).

In *Larkin,* for example, the Fifth Circuit noted that the jury's acquittal could have been based on *either* fact A or fact B. But because the government was required to prove *both* fact A and fact B in a subsequent prosecution,

The State argues that it now possesses more and different evidence-namely that appellant admitted to Mrs. Blaisdell, after his acquittal, that both he and the girls had smoked marijuana that day. But here, as in *Harris v. Washington*,[30] when an ultimate issue has been decided, the constitutional guarantee of collateral estoppel applies "irrespective of whether the jury considered all relevant evidence, and irrespective of the good faith of the State in bringing successive prosecutions."[31]

The underlying idea of both double jeopardy and collateral estoppel

> is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.[32]

While we do not doubt the good faith of the State, we also do not doubt that the jury in the first trial necessarily found that appellant was not intoxicated. The State seeks to distinguish the present situation, arguing that it is analogous to that in *Ex parte Byrd*.[33] It is not. In *Byrd*, the State filed a motion to revoke probation ("MRP"), alleging, in part, that the probationer had failed to participate in a community-based program either until he was successfully discharged or until he received further order from the trial court.[34] At the MRP hearing, the State offered testimony that the probationer left the program as evidence that the probationer had violated a condition of his probation, but the trial court held that the evidence was insufficient because the State failed to prove that he left "without permission."[35] The State immediately filed another MRP,

---

collateral estoppel barred relitigation of *either* fact. *Id.* In the present case, *both* intoxication and causation are necessary elements in the State's current intoxication manslaughter indictment. Thus, collateral estoppel necessarily applies to one or the other fact in a case in which the State must prove both facts. Because appellant only seeks to preclude the State from relitigating the issue of intoxication, we need not decide whether the State would also be precluded from relitigating the issue of causation.

Furthermore, although it is possible, as the dissent notes, that the jury simply exercised mercy in this case and declined to convict despite sufficient evidence, we must assume that the jury made a rational decision. *See Green v. Estelle*, 601 F.2d 877, 878–79 (5th Cir.1979) (holding that, for collateral estoppel purposes, appellate court must take jury "at its word," even if the verdict appears influenced by mercy).

**30.** 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971).

**31.** *Id.* at 56–57, 92 S.Ct. 183. In *Harris v. Washington*, a jury acquitted the defendant of

murder, finding that the defendant had not mailed the bomb which killed the victim and his infant son and seriously injured the victim's wife. *Id.* at 55, 92 S.Ct. 183. The Supreme Court found that the State could not reprosecute the defendant for killing the infant based upon additional evidence, namely a threatening letter that the defendant had allegedly sent to the victim's family. *Id.* at 57, 92 S.Ct. 183. In that case, "the ultimate issue of identity" had already been resolved and therefore could not be relitigated despite new evidence. *Id.* at 56., 92 S.Ct. 183 Although the situation here is not precisely the same, because the new evidence in this case concerns a different statutory source of intoxication, that distinction is insignificant, given the disputed issues and the jury's factual finding.

**32.** *Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

**33.** 752 S.W.2d 559 (Tex.Crim.App.1988).

**34.** *Id.* at 560.

**35.** *Id.* at 561.

setting out the same probation violation, but with much greater elaboration. It alleged that Mr. Byrd: 1) left the center without permission; 2) never returned to the center; 3) did not contact the court or probation department; and 4) was unsuccessfully discharged from the center.[36] Because the latter three allegations were never placed in issue during the first hearing, collateral estoppel did not bar their litigation during the second hearing.[37] Similarly, collateral estoppel would not bar the State from prosecuting appellant for some offense relating to this fatal accident which did not depend upon a factual finding of intoxication (whatever the source) or any other fact necessarily found by the first jury.

■■■ The State also argues that, because it was required to allege which type of intoxicant appellant consumed,[38] collateral estoppel applies only to that specific intoxicant. Accordingly, the State contends, resolving whether collateral estoppel applies depends entirely upon the precise indictment allegations, regardless of the actual evidence or the facts "necessarily" found by the jury. But application of collateral estoppel depends not merely upon the pleadings, but also upon the evidence, charge, jury argument, and any other relevant material.[39] The State fails to point to any evidence, argument, or other material in this record which would support its theory that this jury could have concluded appellant *was* intoxicated, but not by alcohol.

Finally, the State contends that the court of appeals' holding, that "intoxication" was an ultimate fact necessarily decided by this jury, has importance far beyond this one case because "[a] large number of criminal statutes provide for alternative manners or means of establishing certain elements." The State asserts that if the court of appeals' holding in this case is allowed to stand, then collateral estoppel would always bar relitigation of an alternate manner and means. This fear is unfounded. The scope of a factual finding necessarily decided in a particular trial depends upon the evidence and disputed issues in that specific case, and not upon the mere fact that an offense may be committed by different statutory manners and means.[40] Although it is possible to read the court of appeals' opinion in this case as imposing a broad collateral estoppel bar to relitigating an alternative statutory manner or means in *any* case, we do not read its opinion in that light. The court of appeals simply held that, in this particular case, the jury found that appellant was not intoxicated and thus, that ultimate issue cannot be relitigated.[41] We agree with that conclusion.

36. *Id.*

37. *Id.,* at 563–64. *Byrd* would be more analogous to this case had the State first alleged that Byrd left the center without permission from the center's director and then restated that violation as Mr. Byrd having left the center without the trial court's permission. The trial judge in Byrd, clearly stated in his factual findings that the State failed to show Mr. Byrd left "without permission," thus foreclosing relitigation of that issue, regardless of precisely *whose* permission was lacking.

38. *See State v. Carter,* 810 S.W.2d 197, 200 (Tex.Crim.App.1991) (holding that State must include in its charging instrument an allegation of the specific intoxicant which caused intoxication).

39. *State v. Sauceda,* 980 S.W.2d 642, 647 (Tex.Crim.App.1998).

40. In any event, we need not address the question of whether the various statutory sources or causes of intoxication under Chapter 49 of the Penal Code, constitute alternative "manner and means" of committing an offense.

41. *Taylor,* slip op. at 10.

Therefore, we affirm the court of appeals.

HERVEY, J., filed a dissenting opinion in which KEASLER, J., joined.

KELLER, P.J., dissented.

HERVEY, J., dissenting.

I respectfully dissent. I disagree with the Court's decision that in the first criminal prosecution in which the jury returned a general not guilty verdict the jury necessarily found that appellant was not intoxicated by alcohol.[1]

This is a federal constitutional case that involves an application of the doctrine of collateral estoppel "as embodied in the Fifth Amendment guarantee against double jeopardy" because the Court essentially decides that the jury's finding in the prior criminal prosecution that appellant was not intoxicated by alcohol amounts to an "acquittal" or a finding that appellant is not guilty of the offense for which the government now seeks to prosecute him. *See Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469 (1970); *Reynolds v. State*, 4 S.W.3d 13, 19, 21 (Tex.Cr.App.1999) (double jeopardy protects a defendant against subsequent prosecution for an offense for which the defendant has been acquitted). This case, therefore, does not require the Court to examine the question of whether common-law collateral estoppel principles should apply to Texas criminal cases outside of the *Ashe* federal constitutional double jeopardy context. *See Reynolds*, 4 S.W.3d at 21 n. 18 (questioning whether this Court has ever formally adopted common-law

collateral estoppel principles to criminal cases outside of this double jeopardy context) and at 22 (Meyers, J., dissenting) (acknowledging the ambiguity in this Court's collateral estoppel cases by not fully explaining whether they are referring to "constitutional double jeopardy protections or simply to common-law protections"); *Ashe*, 90 S.Ct. at 1203–05 (Burger, C.J., dissenting) (claiming that collateral estoppel principles should not apply to criminal cases and that the collateral estoppel concept "is a strange mutant as it is transformed to control" in criminal cases).

*Ashe's* federal constitutional collateral estoppel double jeopardy doctrine states that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 90 S.Ct. at 1194; *see also Reynolds*, 4 S.W.3d at 19–22 (discussing the constitutional limits of this doctrine on the power of state legislatures to legislate in this area). It is the defendant's burden to prove "that the [ultimate] issue whose relitigation he seeks to foreclose was actually [or necessarily] decided in the first proceeding." *Schiro v. Farley*, 510 U.S. 222, 114 S.Ct. 783, 791, 127 L.Ed.2d 47 (1994) (internal quotes omitted). *Ashe* requires courts to "examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude (sic) whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 90 S.Ct. at 1194.[2] Any "test more technically

---

**1.** The State does not concede that the jury made this finding; the State assumes that it did "for the purposes of the issues presented in this case." *Compare Harris v. Washington*, 404 U.S. 55, 92 S.Ct. 183, 184, 30 L.Ed.2d 212 (1971) (considering it important that the

government "concede[d] that the ultimate issue of identity was decided by the jury in the first trial").

**2.** For the collateral estoppel bar to apply, therefore, it is not enough to say that the jury

restrictive" would, according to *Ashe*, "amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." *Id.*[3]

After examining relevant portions of the record from the first criminal prosecution, I cannot conclude that the jury in that case necessarily found that appellant was not intoxicated by alcohol. The offenses submitted to the jury in that prosecution were intoxication manslaughter and manslaughter. The jury was instructed to find appellant guilty of intoxication manslaughter if it found that appellant's intoxication, if any, caused the victim's death. The **only** theories of intoxication presented to the jury were "either by not having the normal use of [appellant's] mental or physical faculties by reason of the introduction of alcohol into his body" or "by having an alcohol concentration of .10 or more." The charge instructed the jury to convict appellant of intoxication manslaughter if it believed beyond a reasonable doubt that appellant:

did operate a motor vehicle in a public place while intoxicated, either by not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body or by

having an alcohol concentration of .10 or more, and by reason of that intoxication, if any, by accident or mistake, caused the death of [the victim].

The jury was instructed to find appellant guilty of manslaughter if it believed beyond a reasonable doubt that appellant:

did recklessly cause the death of [the victim] by operating a motor vehicle at an excessive speed and by driving into a motor vehicle occupied by [another person].

The State's theory was that appellant's alcohol intoxication caused him to drive recklessly at an excessive rate of speed which caused the accident resulting in the victim's death. Appellant's theory was that he was not intoxicated by any of the two manner and means submitted to the jury but that, if he was, his intoxication was not a contributing factor to the accident. For example, appellant claimed during his opening statement that his accident reconstructionist would contradict the prosecution theory that appellant was driving at an excessive rate of speed, and that the prosecution had to revise its initial figures "almost 20 miles per hour downward" in light of what appellant's accident reconstructionist had to say.

---

**could** have found that appellant was not intoxicated by alcohol. We must be able to conclude that the jury actually or necessarily found that appellant was not intoxicated by alcohol.

**3.** The verdict in *Ashe*, however, was not a general verdict of acquittal; it was a verdict of "not guilty due to insufficient evidence." *See Ashe*, 90 S.Ct. at 1192 and at 1203 (Burger, C.J., dissenting) (referring to this as a "somewhat unorthodox verdict") (internal quotes omitted). So, unlike this case involving a general verdict of not guilty, *Ashe* involved a jury verdict that contained an express finding like one might find in a civil case. *See id.*

This may be significant in light of the United States Supreme Court's more recent decision in *United States v. Watts* which states that it is impossible to know from a general verdict of not guilty "why a jury found a defendant not guilty on a certain charge" and that "the jury cannot be said to have necessarily rejected any facts when it returns a general verdict of not guilty." *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 637, 136 L.Ed.2d 554 (1997). It appears that *Watts* says it is impossible to do what *Ashe* says courts must do (attempt to determine from a general not guilty verdict what the jury found). *See also State v. Sauceda*, 980 S.W.2d 642, 651–52 (Tex.Cr.App.1998) (McCormick, P.J., dissenting).

[The prosecutor] told you that you will hear from police accident reports and I anticipate that you're going to hear that there was not one police accident reconstruction report, but there were two. I anticipate that you will hear that the police-the first police accident report, what brought this case to be tried and first to be indicted, to be tried, came out well over a year ago. And in that initial accident reconstruction report, it reflected that the vehicle was going 88 miles per hour at the time it lost control, and that it was going 80 miles per hour at the time of impact. And then [appellant] got indicted for this crime. You remember when we talked about sometimes the government makes a mistake? I think you will hear that we then hired an accident reconstruction team, a private accident reconstruction team to review this accident. And suddenly, I think you will hear that the government decided to review it's own findings. And I think you will hear that just last week, after that report had been in for well over a year and a half, just last week, the police-the DPS reconstruction team said we made some very severe errors because the speed wasn't 88 when it lost control, it was 69. And the speed wasn't 80 miles per hour àt impact, it was 60. That's not what brought these charges, but that's what I anticipate the DPS officers will tell you, **that they have revised their figures almost 20 miles per hour downward, and will talk about the errors that caused that revision.** And the frightening thing is, if [appellant's] family hadn't had the money to make sure that somebody else was going to check that work, what you would be hearing today, I fear, was that he was going 88 miles per hour. **But now the government acknowledges that this is not a correct report and they have revised those figures. I think you will hear from our expert and I want you to compare the expert that we're going to be putting forward to the expert the government puts forward who will tell you that those figures by the government experts are still too high, that in fact [appellant] was going approximately 57 to 58 at impact, and 60 miles per hour at the point where the government says he lost control of the vehicle. How far, far different than that 88 miles per hour that we lived with for a year and a half.**

Appellant's accident reconstructionist supported these assertions at trial. Appellant's accident reconstructionist also contradicted other aspects of the prosecution's theory of how the accident occurred such as when appellant began to lose control of his vehicle (before the curve at a lower speed limit or after the curve at a higher speed limit).

It was undisputed that appellant had been drinking wine before the fatal accident. Responding to the prosecution's evidence that appellant's BAC at the time of the accident was above .10, the best appellant's toxicology expert could do was to admit that appellant's BAC at the time of the accident was between .07 and .09.

Q. But you—you're saying that—you have come here today to testify that in your best estimate it could be anywhere between .07 and .09?

A. Point–0–7 (.07) to .09, no less than .07, no higher than .09.

Significantly, appellant's toxicology expert also admitted that a BAC of .07 to .09 would cause most people to lose "some of the normal use of their abilities."[4] For example,

4. Appellant's own toxicology expert, therefore, provided testimony to support that por-

Q. Let's talk about—I'm not talking about your chronic drinker. Let's talk about the person who may occasionally drink something, but not a chronic drinker. At what point do you believe that a person loses the normal ability to make complex reaction, or reaction to a complex emergency situation?

A. Again, that is—I want to answer it the best way possible. Most people have a different absorption for the alcohol. And also, they have a different reaction. I have observed hundreds of people under the influence of various substances and you can make some generalizations, but most everybody has a different reaction. One thing that comes to mind is a California Highway Patrol test where they actually took a whole bunch of individuals and they gave them one drink, two drinks, three drinks, and they made them drive around the cones in the parking lot.

Q. Okay.

A. The person that performed the best at .10 was a young person.

Q. Uh-huh (affirmative).

A. And the—I remember—I think—

Q. But did that person perform as well as they did when they were sober?

A. No, most definitely.

Q. Okay. Well—

A. No. Most definitely **there was a deterioration in their ability.**

Q. So **they had lost some of the normal use of their abilities**?

A. **Most definitely.**

Q. Let me ask you, you came up here from Houston?

A. Yes, ma'am.

Q. Did you drive or fly?

A. I drove.

Q. Okay. You know you can fly up? I mean, there is an airplane that comes here.

A. Oh, okay. I use them for out of state. I try to avoid them.

Q. Okay. Let's say—

A. I have tested some of the pilots.

Q. —let's say that you were going to make a quick trip to College Station from Houston, and you made it—it had to quick, so you were going to take the airplane, which I think is Continental? I think it's Continental. It's about a 30 minute flight. And just before you get on this plane, you are told by the stewardess, ladies and gentlemen, our pilot has had a few drinks while he has been waiting for you and we've tested his blood alcohol, it's .07, so he's not intoxicated, would you get on that airplane?

A. No, ma'am.

(Emphasis Supplied).

Appellant's toxicology expert also testified that he should not be driving even at a BAC of .05 and that he would not let his child drive with someone "who was a .05."

Q. So you think, your personal feelings from your studies and work is that at .05 most people are sufficiently impaired that they shouldn't be doing dangerous-type things?

A. I know one thing, I shouldn't be driving at .05 myself.

Q. Would you let your child drive with someone who was a .05?

A. No, God, no.

Appellant's toxicology expert also admitted that alcohol would have been a contributing factor to a hypothetical accident that was consistent with the prosecution's theory of the case.

tion of the intoxication manslaughter charge of "not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body."

Q. Is there any way to know if you factor in egregiously reckless driving, speeding, going off the road, and being out of control with the car, **if you factor that in with the blood levels that you've seen,** do you think that shows some loss of normal use of the mental or physical faculties?

A. I would definitely have to say that there is some contributing factor associated with what you described.

(Emphasis Supplied).

During closing jury arguments, the defense argued that the accident reconstruction testimony (not the toxicology testimony) was "so hypercritical in this case." The defense also argued that, in addition to not proving appellant was intoxicated, the prosecution failed to prove that appellant's intoxication, if any, caused the fatal accident. The last thing the defense told the jury was that it should still acquit appellant even if the jury found that he was intoxicated.

I know how much pain there is in this courtroom. The evidence is not there to convict [appellant] of these offenses. Civil liability, sure. But criminal liability, when we start—because generally the criminal law is defined—being reserved for those people who had intentionally done horrible things, or bad things. They haven't proved their allegations. They haven't proved that he consciously disregarded an unjustified—substantial risk that [the victim] would die. They haven't proved that he had an alcohol content of above .10 at the time he was driving, **and they haven't proved that [appellant] had an accident because that (sic) he was intoxicated.** They haven't proved he lacked the normal use, in fact, their own witness said he seemed perfectly normal. **But before you can convict [appellant], you have to find that the acci-**dent wouldn't have occurred but for that intoxication. In other words, you're given a Charge that says, cause means it had to-it had to be what caused it. And you remember what [a witness] said, he's seen other accidents similar in nature, didn't have a thing in the world to do with alcohol or intoxication.** And we posed questions, what could have caused this accident? And [the witness] said, "Well, it could have been a number of things." The Varner vehicle, you remember, there was some question about where the sun was. But she was only going 20–something miles per hour, much slower than her normal speed. Could be that the Varner vehicle was towards the middle of the road. It could be inattentiveness. It could be an animal ran out. We don't know what caused this accident. **And that's why the accident reconstruction testimony is so hypercritical in this case.** Because if it is as the DPS said, then that is one thing. His speed, he lost control up here because he's going too fast and then he comes back over here, overcorrects. But if you don't accept the DPS version, if you accept [the defense expert reconstructionist witness], that he makes the curve fine and that he is going along and then something happens, and we will never know what it was. We will never know what caused that accident. **But [this witness] told you, "Not necessarily alcohol, not necessarily speed. There is no way to know."** And the government has to prove, beyond a reasonable doubt, what caused that accident. **They have to prove that it was caused by reckless speed or by intoxication.** And if they can't prove that beyond a reasonable doubt, then you must return a verdict of not guilty. And how can any one of you say beyond a reasonable doubt what

caused that accident, unless you believe the Department of Public Safety, that he ran off up here. Some of it flies in the face of the law of physics. Otherwise, there is no way to know. And I know how very difficult it is for all of you to sit there and think, "But we hurt for these people. We hurt for these people, there is pain, and we don't like drinking, and we don't like driving, and we've had bad experiences with it." But the fact of the matter is, **the government hasn't proved their case.**

At one point I was really angry. I was angry about the DPS, that—the various reports, 88 miles an hour, 87 miles an hour. Eighty miles an hour, is clearly the wrong, clearly. And thinking about the horrible consequence it would have had on my client. And then I thought, despite that, it wasn't intentional by those DPS officers, I believe that. And it probably wasn't even reckless. It's just sometimes things happen, accidents happen. This is a tragedy. A verdict of not guilty does not mean that it isn't tragic. A verdict of not guilty means the government has not proved these allegations, these allegations, these allegations beyond a reasonable doubt. **Even if you find he was intoxicated, if you don't find that intoxication beyond a reasonable doubt caused this accident, you must return a verdict of not guilty.**

(Emphasis Supplied).

The prosecution responded by, among other things, reminding the jury that the testimony of appellant's own toxicology expert supported a finding that alcohol had caused appellant to lose the normal use of his mental and physical faculties when the accident occurred.

Now, quite frankly, I did not understand what [appellant's expert]—I did not understand the basis of what he was talk-

ing about. I did understand his conclusion, though, which is that he believes, as a scientist, he believes that at the second [appellant] drove his car into that Suburban, his blood alcohol level wasn't any higher than .09. Now,—**and you can believe him or not,** or you can believe [other witnesses], I mean, that's totally up to you folks. **But let's—let's assume that everything out of [appellant's expert] testimony is absolutely dead certain true, gospel truth. Then what? We know that people do not start losing their mental and physical faculties at the point that they reach .10. It isn't like filling up a glass and it doesn't count until it's overflowing. Point 1–0(.10) is the political decision our legislature has made to say we don't care what your behavior is, we don't care if there's any bad driving, we don't care if there's any indication that you've lost control, if your blood's a .10, that's it, you're drunk. But way before that, way before that, you start—everyone, everyone, you, me, Mr. James, Mr. Spillane, Judge Delaney, everybody in this room including [appellant], and that was the testimony [of appellant's expert], everybody has lost some mental capacity.**

(Emphasis Supplied).

These portions of the record demonstrate that the jury could have acquitted appellant without necessarily finding that he was not intoxicated by alcohol. *See Ashe*, 90 S.Ct. at 1194 (issue is "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration"). It is significant that appellant's own toxicology expert did not seriously contest the loss of normal use of mental and physical faculties theory of intoxication. *See Dowling v. U.S.*, 493 U.S.

342, 110 S.Ct. 668, 673–74, 107 L.Ed.2d 708 (1990) (collateral estoppel principles did not preclude relitigating issue of the defendant's identity partly because that issue was "not seriously contested" in the first trial). In addition to possibly basing its acquittal of appellant on a finding that he was not intoxicated, the jury could also have possibly found that appellant was intoxicated (under the loss of normal use theory) but acquitted him because it did not believe that this intoxication was a contributing factor to the accident which the record reflects was one of the theories appellant urged at the first trial.[5]

The Court's opinion concedes that it is "a possibility" that the jury did not necessarily find that appellant was not intoxicated by alcohol. This should be fatal to appellant's collateral estoppel claim. *See Schiro*, 114 S.Ct. at 791 (defendant must prove that "issue whose relitigation he seeks to foreclose was actually decided in the first proceeding"); *Ashe*, 90 S.Ct. at 1194 (issue is "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration"). But, the Court still concludes that this prosecution is jeopardy-barred because, even if the jury found that appellant was intoxicated, it nevertheless could have found that the "intoxication itself was not a contributing factor to the accident" in which case "collateral estoppel would apply to causation, rather than intoxication."

But, in analyzing the collateral estoppel issue this way, the Court concludes that this prosecution is jeopardy-barred even though it is unable to decide what the jury necessarily found in the first trial. *But see Schiro*, 114 S.Ct. at 791 (defendant must prove that "issue whose relitigation he seeks to foreclose was actually decided in the first proceeding"). In other words, the Court apparently bases its decision on what the jury **could** have found without deciding what the jury **necessarily** found. *But see id.* My understanding of collater-

5. The Court decides that "the jury in this particular case necessarily concluded that" appellant was not intoxicated under either theory of intoxication submitted to the jury and that appellant "did not recklessly drive at an excessive speed into another vehicle." However, it is impossible to determine from the jury's general not guilty verdict what the jury actually and necessarily found. *See Watts*, 117 S.Ct. at 637 (impossible to know from a general not guilty verdict "why a jury found a defendant not guilty on a certain charge" and "jury cannot be said to have necessarily rejected any facts when it returns a general verdict of not guilty"). The jury could have made any one of these findings meaning that the government is not precluded from relitigating any of these issues in this proceeding. *See Schiro*, 114 S.Ct. at 791 (defendant must prove that "issue whose relitigation he seeks to foreclose was actually decided in the first proceeding"); *Ashe*, 90 S.Ct. at 1194 (issue is "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration"). The jury could even have found, based on the testimony of appellant's accident reconstructionist, that there was "no way to know" what caused the accident. The jury may have just had a "reasonable doubt as to [appellant's] guilt." *See Watts*, 117 S.Ct. at 637 (a general not guilty verdict "is not a finding of any fact" and merely acknowledges that the government failed to prove its case beyond a reasonable doubt). It is even possible that the jury made all necessary findings in favor of the prosecution but decided not to convict anyway. There are any number of possible explanations for the jury's general not guilty verdict at appellant's first trial. *See Dowling*, 110 S.Ct. at 674 (defendant failed to prove that jury decided issue of identity in his favor at first trial because there were any number of possible explanations for the jury's acquittal verdict at the first trial). This perhaps is one reason why the collateral estoppel concept "is a strange mutant as it is transformed to control" in criminal cases involving general not guilty verdicts. *See Ashe*, 90 S.Ct. at 1205 (Burger, C.J., dissenting).

al estoppel law, however, is that for the collateral estoppel bar to apply, the Court must be able to decide what the jury necessarily found in the first trial, not what it could have found. *See id.*

The Court's analysis involving what the jury could have found in appellant's first trial also fails to take into account that it is entirely possible that the jury did not speak with one voice in acquitting appellant. For example, it is possible that some of the jurors believed that appellant was not intoxicated, some of the jurors believed that he was intoxicated but his intoxication was not a contributing factor to the accident, and some of the jurors believed that appellant should have been acquitted for other reasons. *Cf. Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 2506, 115 L.Ed.2d 555 (1991) (Scalia, J., concurring) (stating the general rule that "when a single crime can be committed in various ways, jurors need not agree upon the mode of commission"); *Kitchens v. State,* 823 S.W.2d 256, 259 (Tex.Cr.App.1991), cert. denied, 504 U.S. 958, 112 S.Ct. 2309, 119 L.Ed.2d 230 (1992). Under these circumstances, it cannot be said that the jury necessarily found anything in the first trial except possibly that it had a reasonable doubt of appellant's guilt. *See Watts,* 117 S.Ct. at 637 (general not guilty verdict "merely proves the existence of a reasonable doubt" of the defendant's guilt). This could explain why the United States Supreme Court in *Ashe* considered it very important to point out that the only conceivable issue upon which the jury could have acquitted Mr. Ashe was that "he had [not] been one of the robbers." *See Ashe,* 90 S.Ct. at 1195. Had the jury been able to acquit Mr. Ashe for this and other reasons, it appears that *Ashe* may well have reached a different result.

Straightforward application of the federal rule to the present case can lead to but one conclusion. For the record is utterly devoid of any indication that the first jury could rationally have found that an armed robbery had not occurred, or that Knight had not been a victim of that robbery. The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not. The federal rule of law, therefore, would make a second prosecution for the robbery of Roberts wholly impermissible.

*Id.*

Unlike *Ashe,* the Court cannot decide what the jury necessarily found in appellant's first trial. And it is impossible to decide what the jury necessarily found in appellant's first trial because there are any number of possible explanations for the jury's acquittal verdict at appellant's first trial. *See Dowling,* 110 S.Ct. at 674.

Even if it could be said that the jury in the first trial necessarily decided that appellant was not intoxicated by alcohol, the Court still errs to decide that the prosecution cannot litigate for the first time in this proceeding whether appellant was intoxicated by marijuana or by a combination of marijuana and alcohol. It is clear that these latter two issues were not litigated and, therefore, could not have been necessarily decided in the first trial. *See Dowling,* 110 S.Ct. at 673 (defendant must prove that issue whose relitigation he seeks to foreclose was actually decided in the first proceeding).

Apparently the Court decides that federal constitutional collateral estoppel principles prevent the prosecution from litigating these two issues of intoxication in this proceeding because it was "the more general issue of intoxication-was he or wasn't he-that was disputed" in the first trial and because the prosecution could have but did not litigate these other two theories of

intoxication in the first trial. But federal constitutional collateral estoppel principles only prohibit a party from relitigating an issue that was necessarily decided in the first trial, and it is clear that the only issue litigated (and that could possibly have been decided) in the first trial was whether appellant was intoxicated by alcohol. *See id.*

In deciding that the prosecution cannot litigate the other two theories of intoxication (marijuana and combination of marijuana and alcohol) in this proceeding because the prosecution could have litigated them in the first trial, the Court adds a new element to the federal constitutional collateral estoppel doctrine that *Ashe* and other United States Supreme Court cases do not require. The Court's decision expands *Ashe* to preclude litigating in a second trial issues of ultimate fact that could have been decided in the first trial. But the federal constitutional collateral estoppel doctrine applies only to issues of ultimate fact that were actually decided in the first trial. *Ashe*, 90 S.Ct. at 1194 (applies only "when an issue of ultimate fact has **once been determined** by a valid and final judgment" in the first trial). (Emphasis Supplied).

I respectfully dissent.

