Court of Criminal Appeals Opinion #AP-74,715b



 

 

 
IN THE COURT OF CRIMINAL APPEALS
OF TEXAS





NO. 74,715

 



EX PARTE WILLIE MACK MODDEN, Applicant







ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM ANGELINA COUNTY







Hervey, J., filed a dissenting opinion in which Keasler, J., joined.



DISSENTING OPINION 



 I respectfully dissent. The Court commutes applicant's death sentence to a life sentence
based upon its decision that the record supports a finding that applicant is mentally retarded. 
However, after a careful consideration of all of the evidence, I would hold that the record does not
support this finding.

 In Atkins v. Virginia, the United States Supreme Court decided that the Eighth Amendment's
"evolving standards of decency that mark the progress of a maturing society" prohibit executing
mentally retarded people. See Atkins v. Virginia, 122 S.Ct. 2242, 2247-52 (2002). Atkins left to the
states "the task of developing appropriate ways" to determine "which offenders are in fact retarded." 
See Atkins, 122 S.Ct. at 2250.

 In response to this, this Court in Ex parte Briseno adopted the American Association on
Mental Retardation (AAMR) criteria, which are codified in Tex. Health & Safety Code §
591.003(13), and some other evidentiary factors in addressing Atkins mental retardation claims. See
Ex parte Briseno, S.W.3d slip op. at 8-9, 11-12 (Tex.Cr.App. No. 29,819-03, delivered
February 11, 2004) (mental retardation means "significant subaverage general intellectual
functioning that is concurrent with deficits in adaptive behavior and originates during the
developmental period"). (1) We also stated in Briseno that "the ultimate issue of whether [a] person
is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment
is one for the finder of fact, based upon all of the evidence and determinations of credibility." See
Briseno, slip op. at 12.

 This latter statement, however, does not quite apply to this habeas proceeding for several
reasons. The record in this habeas proceeding reflects that, in exchange for applicant's guilty plea
to several criminal offenses, the State agreed to a commutation of applicant's death sentence to a life
sentence contingent on acceptance by the habeas court and this Court, of the parties' agreed finding
and agreed evidence that applicant is mentally retarded. The State reserved "the right to oppose a
finding of mental retardation" if this agreement cannot be fulfilled. In relevant part, this agreement,
in the form of a letter from the State to applicant's lawyer, states:

 It is anticipated, understood, and expected that once your client [applicant] has plead
guilty to the above five (5) offenses, and the same day and at the same proceeding in
which your client pleads, and only in the event that your client pleads to the
above, the state will agree and stipulate that your client is mentally retarded and
that the state and yourself will present the [habeas court] with Agreed Findings of
Fact and Conclusions of Law, along with agreed evidence of your client's mental
retardation to that end. The state will further agree and request that your client's
sentence of death be commuted to life. The parties hereto further understand and
stipulate that this agreement is contingent upon [the habeas court's] acceptance of
Agreed Findings of Fact and Conclusions of Law and the Court of Criminal Appeals'
adoption of Findings of Fact and Conclusions of Law that find [applicant] to be
mentally retarded.


 In the event that [applicant] does not plead guilty to the above referenced offenses or
in the event [the habeas court] or the Court of Criminal Appeals does not accept or
adopt the Agreed Findings of Fact and Conclusions of Law, the state reserves the
right to oppose a finding of mental retardation.

 

(Emphasis added).

 The agreed evidence between the State and applicant consists of Kartye's 1985, Brownlee's
1988, and Clark's 1992 psychological evaluations of applicant which are discussed in the Court's
opinion. See Ex parte Modden, S.W.3d slip op. at 5-7 (Tex.Cr.App. No. 74,715, delivered this
date). Without hearing any live testimony, the habeas court apparently accepted these psychological
evaluations and signed off on the parties' agreed finding that applicant is mentally retarded. This
finding tracks the AAMR and the Section 591.003(13) definitions of mental retardation. See
Briseno, slip op. at 8-9, 11-12. But, none of these psychological evaluations state that they are based
on the AAMR and the Section 591.003(13) definitions of mental retardation. And, neither Kartye,
Brownlee nor Clark have ever testified that their psychological evaluations and opinions are based
on the AAMR and the Section 591.003(13) definitions of mental retardation.

 The agreed finding in this habeas proceeding that applicant is mentally retarded also is not
the result of "determinations of credibility" at an adversarial live hearing meant to test the truth of
applicant's mental retardation claim. More important, the parties' agreed evidence does not take into
account all of the evidence pertinent to applicant's claim of mental retardation from applicant's 1985
trial and his 1992 retrial. See Briseno, slip op. at 12 (mental retardation determination must be based
upon all of the evidence). For example, the parties litigated applicant's mental retardation claim in
an adversarial setting before a jury at applicant's 1992 retrial where the State presented its own
psychological expert who testified that applicant is not mentally retarded. (2) It is fairly obvious from
examining the 1992 record from applicant's 1992 retrial that the jury rejected applicant's claim that
he is mentally retarded. (3) See Ex parte Taylor, 101 S.W.3d 434, 440-45 (Tex.Cr.App. 2002)
(determining from an examination of the record what a jury found by a general not guilty verdict). 
Briseno, therefore, does not require this Court to accept the agreed finding that applicant is mentally
retarded based on Kartye's 1985, Brownlee's 1988, and Clark's 1992 psychological evaluations of
applicant. This is not to say that these evaluations are irrelevant, but they should be considered with
all of the other relevant evidence that completes the inquiry into applicant's claim of mental
retardation. (4)

 Overwhelming evidence was presented at applicant's 1985 and 1992 trials that applicant
meets very few, if any, of the Briseno factors and that applicant is nothing like Steinbeck's childlike
Lennie. (5) See Briseno, slip op. at 8, 12. This evidence indicates that applicant has been a violent
criminal for most of his adult life. Though the evidence does indicate that applicant may have
limited intellectual capabilities, it also indicates that no one considered applicant to be mentally
retarded while he was growing up and that upon reaching adulthood applicant has been able to take
care of himself both in and out of prison where (even before he committed this capital offense in
1984) he spent a good part of his adult life. The thrust of his mental deficiency evidence at both his
1985 and 1992 trials is that applicant's mental deficiencies cause him to have poor impulse control
and to be influenced by others for their own means, and that all of this is exacerbated by applicant's
frequent use of alcohol. But the evidence shows that many of the criminal offenses that applicant
has committed during his life were planned and carried out all by himself.

 The evidence also indicates that applicant might even possess some leadership qualities. For
example, a September 6, 1982, prison disciplinary report indicates that applicant was placed in
Administrative Segregation for inciting other inmates not to perform their work duties.

 On September 6, 1982, at approximately 3:15 P.M., I noticed that the trays in both
the North and South Dishrooms were stacking up and not being washed. I then
entered the dishroom and found that all of the inmates assigned to the Dishroom were
refusing to wash any of the trays. These inmates were [applicant and five others]. 
These inmates stated that they were refusing to wash any dishes because they could
not get any ice water in the Dishroom. [Applicant] was placed in Administrative
Segregation in order to prevent the inciting of further work stoppages and to prevent
the disruption of unit procedures.


 The evidence also indicates that applicant is capable of responding "coherently, rationally
and on point to oral or written questions." See Briseno, slip op. at 12. For example, an October 5,
1982, prison disciplinary report states:

 On October 5, 1982, at approximately 2:20 P.M. while A/L work force was cutting
weeds, [applicant] was overheard to say "Fuck the boss and old motor mouth too." 
Upon questioning [applicant] he again stated "Fuck you and the Captain because
you'll [sic] ain't going to fuck with me." I told [applicant] to go to work and he
replied "If I get a case, I am not going to work and I am going to sue your ass.["]
[Applicant] was placed in adminsstrative [sic] segregation in order to prevent a
disruption of unit procedures.


 The record further indicates that applicant presented no evidence at his 1985 trial that he was
mentally retarded. Kartye's 1985 psychological evaluation, which was admitted into evidence at that
trial, does not conclude that applicant is "mildly mentally retarded." (6) And, Kartye never testified at
applicant's 1985 trial that applicant is "mildly mentally retarded." Kartye never even used the term
"mental retardation" at applicant's 1985 trial. Kartye testified that applicant's "limited intellectual
resources" caused him to have "impulse control problems" but that applicant was also capable of
acting deliberately. (7) It is also significant that applicant filed a coherent pro se brief on direct appeal
from his 1985 capital murder conviction. (8)

 Applicant did claim that he was mentally retarded at his 1992 retrial after the United States
Supreme Court had decided Penry v. Lynaugh which held that the then-existing Texas special issues
framework failed to provide Penry's jury with a vehicle to give mitigating effect to relevant
mitigating evidence of Penry's severe mental retardation. (9) Two psychological evaluations of
applicant (Brownlee's 1988 evaluation and Clark's 1992 evaluation), concluding for the first time
that applicant is "mildly mentally retarded," (10) were admitted into evidence at applicant's 1992 retrial. 
Before this no one had ever previously noticed applicant's mental retardation.

 Brownlee did not testify at applicant's 1992 retrial. According to Brownlee's 1988
evaluation, applicant, unlike Steinbeck's Lennie, enjoys torturing animals. This evaluation, among
other things, states:

 [Applicant] said that he tortured animals often, either by burning them or hanging
them. Upon exploration of the feelings associated with that, he had no affective
statement, but he said he did like to see them suffer and squirm.


 Clark testified at applicant's 1992 retrial. Among other things, she testified that she would
place applicant "somewhere as far as functioning in the lower three to five percent of the
population," meaning apparently that, according to Clark, three to five percent of the population is
"mildly mentally retarded" which interestingly is about three to five times more than that claimed
by the defense expert in Atkins. See Atkins, 122 S.Ct. at 2245 n.5 (forensic defense psychologist
testified that mental retardation is "a relatively rare thing" affecting "about one percent of the
population"). The State commented on this during closing jury arguments:

 Now, let's talk about psychologists a little bit. Dr. Frankie Clark came up here, and
I think she testified as to her honest opinion. She says he's retarded. She says about
50 people out of 1,000 would be about in the same boat as the Defendant. So if there
are 30,000 people in our town, about 1,500 are in the same boat as Willie Mack
Modden.


 The State presented its own psychological expert at applicant's 1992 retrial. This is the only
psychological expert to testify on the issue of applicant's mental retardation based on the AAMR and
the Section 591.003(13) definitions of mental retardation. Mostly through the use of supported-by-the-evidence hypotheticals, the State's psychological expert testified at applicant's 1992 retrial that
applicant is not mentally retarded under the AAMR and the Section 591.003(13) definitions of
mental retardation.

 Q. Okay. Now, Dr. Quijano, you know that one of the things in controversy in this
trial is the issue of mental retardation. Could you tell the jury, please, sir, what is
mental retardation?


 A. Mental retardation is a condition of an individual that has to meet three criteria,
and all three must be met before the label of mental retardation can be legitimately
given.


 Number 1, the individual must have a subaverage or below-average intellectual
functioning as measured by an individually administered intellectual test, intelligence
test.


 Number 2, which is very important, and that is, the individual must have an adaptive
daily functioning skill that's below average and that would require constant
supervision.


 Number 3, that these two deficits, the intellectual as well as the adaptive deficits,
must occur before age 18 to rule out victims of stroke and accidents with brain
trauma.


 Q. Okay. Now, doctor, you mentioned functioning skills and adaptive behavior. 
What sort of things are you talking about?


 A. By adaptive skills, we mean the skills needed by an individual to live on a day-to-day basis. And those are-the questions asked are as follows:


 Are they able to take care of their own personal hygiene? Can they eat without
assistance? Can they recognize hunger? Can they procure food for themselves? Can
they cook simple meals? Can they recognize danger in that you don't cross the street
when a big truck is coming your way? Can they go to a store and negotiate a
purchase? Can they know if they're being cheated by somebody else? Can they take
medicine when they are told to or when they need to?


 All of these things are considered adaptive skills, or some people call them daily
skills of daily living. 


 Q. Okay. Dr. Quijano, let me ask you this. Assume, please, sir, that the person-the
Defendant that we're concerned with here today, Willie Mack Modden-assume that
there is evidence that the Defendant is able to play dominoes, to keep score; assume
that he is able to play chess. Assume that he is able to play basketball.


 Assume that he is able to order materials and construct jewelry boxes out of
matchsticks with designs. And assume that he is able to negotiate to sell those to
people. Assume that he says, hey, buy this for your girl friend; I know you've got a
girl friend or somebody you want to give this to; hey, will you give me $15; you
won't do that; will you give me 12.


 Assume, doctor, that we're dealing with an individual who, by himself, stashed a gun
and kept it for some period of time and until he needed it; then he went and got the
gun, and he went and hid in some bushes outside of a convenience store. And he
waited until near closing time, and he waited until the lady took the trash out. And
he pulled the gun on her, and he made her go back in the store. And he made her
give him the money. And then assume, doctor, that he made the woman pull her
clothes off so that she would have to re-dress to avoid embarrassment before she
summoned help to give him more time to get away.


 Assume, doctor, that this person, when they were incarcerated in TDC, learned the
rules and regulations of the Texas Department of Corrections. And assume that if a
guard did something that he didn't approve of or that he felt was against the rules,
that he would summon another guard. And if that guard was not able to answer his
question, assume, doctor, that he would summon the supervisor, such as the sergeant,
and that he would verbalize his complaint and say: this is against the rules; that man
can't do that to me.


 And assume, doctor, that this person were incarcerated in jail. And assume that they
decided that they wanted to escape. And assume that they got with other inmates,
and assume that they battered a hole in the wall. And assume that the Defendant
said, I'm going to get out, and I'm going to burn down the courthouse so there won't
be records on me. And assume, doctor, that this person said, I'm then going to go kill
the people that helped put me in the penitentiary in the first place.[ (11)]


 And assume, doctor, that this person were [sic] offended by somebody. Assume
somebody hit this person when they were in the penitentiary. And assume that they
procured razor blades, and assume that they melted them into the handle of a
toothbrush. And assume that they waited until the next day when the offending
person was in the shower and had their face lathered up. And assume that this person
then went in and cut that person's throat.


 Doctor, are these things consistent with a mentally retarded person?


 A. No, they are not.


 Q. Can you tell me why they're not?


 A. The hallmark of a mentally retarded person is simplicity of thinking; that they can
maybe handle one thing at a time, maybe two. The mentally retarded people used to
be called the simpleminded.


 These behaviors that you have described are very complex behaviors. They require
multiple steps in the mind. They require that you-that you keep four or five, six
different things in mind and then manipulate them intellectually and mentally. Those
are complex acts. The planning, the forethought, the anticipation of consequences,
the thinking on the feet; all of those are complex mental activities that a true mentally
retarded person, by definition, cannot do.[ (12)]

 

 This expert also provided several explanations on why applicant's IQ test scores contained
in his penitentiary records ranged from 57 to 83 before he got into this current trouble.

 Q. Okay. Now, in this record where it shows the Defendant's age of 18, which is
marked as State's Exhibit 26, it shows an IQ score of 57?


 A. That's correct. 


 Q. Okay. Now, in this record, which is State's Exhibit Number 28, and it shows the
Defendant's age as 26. What IQ score does it show?


 A. It shows 83.


 Q. Now, I will-these records are here, doctor, if you need to look at them further to
explain that; but I'd like to discuss that with the jury and-how do you account or can
you account, sir, for the wide range in variations of IQ scores in the 57 range all the
way up to 83. What's the deal?


 A. Okay. The-given this information, if I were asked to account for that-assuming
that the tests were administered properly, and the only thing has changed would be
the motivation of the person taking the test.


 If you are tested before your trial, it is to your best interests to test down. If you are
tested after the trial, once you're in prison where you may be wanting a better job
assignment, where you may be wanting to go to school, or where you may be wanting
a more free living arrangement-the better you are off, the better your chances are
because if you are retarded in a prison, then your movements are limited. You're
supervised more. You cannot get good jobs and so on and so forth.


 So one possibility is that you are now-you are no longer playing to the problem of
facing charges; that is all behind you, and you are testing better and maybe more
accurately. However, there are prisoners who would say, I tested down, because
these people may want to be assigned to Beto I, which is closer to their home, and
that is where the mentally retarded program is; and you test down.


 Or you may want to have other programs available for the mentally retarded that that
is not available for general population. And people do that all the time. They get to
the MR program; and they say, well, this is not what I expected; give me another test. 
And they test higher, and we kick them out.


 Q. Dr. Quijano, let me ask you this. I believe that the test where the IQ score is 83
shows an interview on September the 10th, 1974. Now, would there be any change-is
there any reason for a person to change their attitude toward testing between 1974
and now in the penitentiary system to your knowledge?


 A. Yes.


 Q. Could you explain that to the jury, please, sir?


 A. Before 1984, when I went back to the system to implement the federal court
orders, there was no specialized program for the mentally retarded, and there was no
special arrangement for them. You were essentially treated by the system the way the
system thought mentally retarded people should be treated. And the motivation at
that time was to test up because you have to compete with other inmates for better
jobs. These days there is less motivation for that.


 The motivation now, depending on what you want, is to test down because you have
a richer environment in a specialized program. Our mentally retarded program is a
very expensive program because you have case managers and music therapy and
occupational therapy. You have your own gymnasium. You have your own schools. 
It's a lot richer program. You have basic janitorial skills training and job programs. 
So the motivation has shifted in the prison, depending on what you want to
accomplish.

 

 This expert also testified that a person cannot fake a higher IQ score "because you either
know the answer or you don't."

 Q. I've got a couple of things, Dr. Quijano, that I want you to look at. I'm going to
try to be brief on this. This is Dr. Clark's report, I believe. And we've got Dr.
Kartye's test here. And this, I believe, is a psychiatric evaluation by Dr. Brownlee. 
Okay?


 First, I want to talk about the two tests which have scores on them. Now, doctor, I'll
ask you to-well, there's a date on this. We don't have to assume anything. 
Examined 1-26-1985; examination, 7-11-92. Now, you mentioned performance IQ. 
And I believe that Dr. Kartye's report reflects a performance IQ of 74, and Dr.
Clark's report reflects a performance IQ of 65. Is this, the more recent test, lower?


 A. Yes.


 Q. What-how do you square that up?


 A. Well, two possibilities. The most recent test is more suspect than the previous
test for two reasons. Number one, a person cannot fake correct answers because, if
you give the correct answers, you obviously know the correct answers. So it is-if
you score high-if you're asked questions, and you gave the answers, you obviously
know at this level. It is much easier to say, I don't know.


 It's easier to fake lower scores than to fake higher scores. You cannot fake higher
scores because you either know the answer or you don't. You can fake a lower score
by saying, I don't know, or if you don't have enough motivation to complete the test,
or if you're not trying too hard.


 The second possibility in which our profession is warned against is testing when one
is in trouble. You must always suspect what we call malingering; that is, an
exaggeration of symptoms when one is in trouble because of our human nature to
protect ourselves. And so these scores can be explained by those two possibilities.


 The State's expert also testified that his opinion about applicant's mental capacity was based
in part on applicant's prison records before he got into this current trouble and that any testing of
applicant after he got into this trouble would be of no benefit.

 Q. Okay. Do you have sufficient information at your disposal to form an opinion
about him and his mental capacity?


 A. Yes, I do.


 Q. Okay. And you have how many years' worth of penitentiary records?


 A. The Defendant's records?


 Q. Yes, sir.


 A. Not mine. Okay. Four tenures in TDC.


 Q. Okay.


 A. I don't know the exact number of years.


 Q. And, doctor, do you have at your disposal the test results of other psychologists?


 A. Yes, I do.


 Q. Would it be of benefit to you to be able to test the Defendant?


 A. At this late stage it would not be of benefit to me or anybody to test him because
of the motivation factor. A person that's in trouble-and the answers are now
questionable, and we can repeat this over and over again, and we'll get different test
results, depending on what the situation is.

 

 The best evidence that applicant is not mentally retarded came from applicant himself when
he testified at his 1985 trial. (13) Applicant testified at the punishment phase of his 1985 trial how he
robbed a convenience store clerk and stabbed her 16 times in the face and neck while she begged for
her life and implored applicant to consider her three children. Applicant later, matter-of-factly,
described to several friends how he murdered the sobbing and terrified victim. Applicant testified
that he decided to kill the victim before he actually killed her (meaning that he "deliberately" killed
her). He testified that he killed the victim because he did not want to leave any witnesses. 
Applicant's testimony from the punishment phase of this trial also indicates that after the crime
applicant was smart enough to destroy evidence and to "artfully dodge" police questioning about his
involvement in the crime. (14) Applicant also testified about his plan to take a hostage and escape from
the county jail.

 The State's psychological expert testified at applicant's 1992 retrial that, in forming opinions
about a person's mental ability, it is also important "to look at what the person actually does" and
not to make judgments "about a person's character on the basis of test results only."

 Q. Doctor, is it possible to look at what someone actually does and use that as a basis
for an opinion as to that person's mental ability or that person's future behavior, just
as you could use test results?


 A. Well, it's more important to look at what the person actually does. And it is not
professional or ethical to make a judgment about a person's character on the basis of
test results only.


 Responding to Kartye's psychological testimony, the State argued during closing jury
arguments at applicant's 1985 trial:

 Then you have to go toward the glimmer of hope that you can get somebody
sidetracked on some collateral issue. As it turned out, it was totally insignificant in
answering those two questions. And that is when in desperation, Joe Kartye was
called to testify. You know, Joe Karty [sic]. I like Joe Karty [sic]. He's a likeable
type person. I didn't agree with him on some things. Some things I don't disagree
with him on.


 For instance, the report that you have shows that [applicant] has a low I.Q. and he is
easy led [sic] and he strikes out and he acts impulsively. And I believe a lot of that. 
I don't think that he is the most intelligent person in the world, but I think he is
smarter than Mr. Kartye gives him credit for being.


 And you saw him on the witness stand. On direct examination and cross examination
and on many occasions he corrected what his attorney said. He would back up and
re-phrase what I said or whatever the situation was. This man is very alert as to what
was going on, and he knows the consequences of what he was doing, and that is why
we are here today on the issues of deliberate and probability.

 

 Considered in its entirety, the record does not support the habeas court's finding that
applicant is mentally retarded. See Briseno, slip op. at 18 -19 (this Court's review of a trial court's
findings of fact and conclusions of law on a mental retardation claim "remains the same as it has
always been on habeas corpus applications," and this Court may reject the habeas court's findings
that the record does not support). The evidence overwhelmingly supports a finding that applicant
is not mentally retarded, and the contrary opinions of applicant's psychological experts can politely
be described as "incredulous as a matter of law." See Atkins, 122 S.Ct. at 2246 (noting that the
dissenters in the Virginia Supreme Court rejected the state's expert opinion that Atkins possesses
average intelligence as "incredulous as a matter of law").

 The Court's opinion makes much of the habeas court's pre-Penry finding from a 1988 habeas
proceeding that applicant is "mentally retarded" (15) and of this Court's 1992 opinion from that
proceeding deciding that applicant's "evidence of mental retardation" entitled him to a new trial
under Penry. (16) The record does indeed reflect that in 1988 applicant filed a habeas corpus
application claiming, among many other things, that the execution of a mentally retarded person
would violate the Eighth Amendment and that this very issue was then pending in the United States
Supreme Court in Penry. The record also reflects that the habeas court conducted a hearing on this
habeas corpus application in November 1988. At this hearing Kartye testified on behalf of the State. 
Kartye actually used the term and, testified for the first time that applicant was suffering from, "mild
mental retardation."

 Q. [STATE]: Dr. Kartye, you're the same Dr. Kartye who previously examined
[applicant], were you not?


 A. [KARTYE]: Yes.


 Q. According to your examination, did you make a determination as to his level of
intelligence?


 A. Yes, I did.


 Q. And do you recall what that was?


 A. Mild mental retardation.


 Kartye also testified on direct examination that applicant was capable of acting
"deliberately."

 Q. [STATE]: From having examined [applicant], Doctor, I would ask if whether or
not you feel he could ever act deliberately?


 A. [KARTYE]: Yes, I feel that he can.


 On cross-examination, Kartye testified that applicant could adequately function outside an
institutional environment but not without endangering himself or others.

 Q. [DEFENSE]: Dr. Kartye, in the report that you provided during the trial of this
case in 1985, you stated and I quote, "It would appear that [applicant] lacks cognitive
and behavioral controls necessary to effectively regulate his behavior." Do you recall
that statement?


 A. [KARTYE]: Yes, I do.


 Q. Do you believe that that's the truth?


 A. Yes.


 Q. And with regard to your testimony here this morning, did I understand you to state
correctly that most mildly retarded persons can function adequately outside an
institutional environment?


 A. Yes, they can.


 Q. Do you believe that [applicant] can?


 A. He has functioned outside the environment all his life until he was arrested.


 Q. You're aware of his criminal record, aren't you?


 A. Yes.


 Q. Do you think he could function outside a structured environment without endangering
himself or others?


 A. No.


 On re-direct examination, Kartye testified that applicant's inability to function outside of a
structured environment without hurting other people was because of his past criminal history and
not because of his degree of mental retardation.

 Q. [STATE]: Dr. Kartye, just one question. You said a minute ago that, in your
opinion, [applicant] could not function outside-in society without doing harm to
himself or others; is that correct?


 A. [KARTYE]: That is correct.


 Q. Is that based-do you base that opinion on his degree of mental retardation or his
past criminal history?


 A. His past criminal history.


 Brownlee testified at the November 1988 habeas hearing on applicant's behalf. Brownlee
testified that applicant is mentally retarded which causes applicant not to have the intellectual
capability to act "deliberately" or "intentionally" or of being "sane." For example, Brownlee
testified how applicant's mental retardation causes applicant not to have the intellectual capability
to be "sane" in the sense of knowing the difference between right and wrong and that for applicant
"hurting another person would be like soiling his pants."

 Q. [STATE]: Why do-why would he try to hide his wrong if he didn't know the
difference?


 A. [BROWNLEE]: Because there's a higher level of wrong that we imply to being
caught in doing something bad. You know, there is a certain degree of shame at
messing your pants, and I'm sure that, you know, [applicant] would have that shame
if he soiled his pants. And in his mind hurting another person would be like soiling
his pants. It's a thing that causes shame, but it's not something that you feel so bad
about because you understand the long-term implications of death, that you
understand the impact on other people. Like he told me in my interview, he made
[the victim] go to Heaven, and people should be happy about that. That's an absurd
assumption for a person who has a higher degree of intelligence.


 Q. So you really think that he thinks he did nothing wrong, and they should be happy
because he made her go to Heaven?


 A. That's what he told me, yeah.


 Brownlee also testified that Kartye's psychological report was "insufficient to help [him] in
any way." 

 Q. [DEFENSE]: Referring you back to Dr. Kartye's report, based on your knowledge
and experience as a psychiatrist, do you have an opinion as to the overall quality of
his examination of [applicant]?


 A. [BROWNLEE]: If this was a report prepared by a psychologist that I would
ask-I'd have him redo it because it's insufficient to help me in any way.

 

 The State also presented several police witnesses who testified that, during their numerous
interactions with applicant prior to his 1985 trial, they did not notice applicant's mental retardation. 
One of these witnesses apparently surprised the defense when he testified that he has "personal
knowledge of how a mentally retarded person might" act.

 Q. [DEFENSE]: Have you had experience before in your work with mentally
retarded defendants?


 A. [MORRIS]: Would you-


 Q. Have you ever-in the course of your investigation as an officer of the Department
of Public Safety, have you ever dealt with mentally retarded defendants?


 A. Not that I know of, sir.


 Q. So you don't-you don't have any personal knowledge of how a mentally retarded
person might interact with you as opposed to a person of normal intelligence?


 A. Yes, I do.


 Q. And what is that based on?


 A. I have a son that's [sic] mentally retarded.


 Q. But you've never dealt with any mentally retarded defendants?


 A. No, I have not.


 Q. And you had no reason in your discussion with [applicant] to think that he was
mentally retarded?


 A. I do not.


 [DEFENSE]: Pass the witness.


 To the extent that the Court's opinion suggests that the habeas court's finding in the 1988
habeas proceeding that applicant is "mildly" mentally retarded is dispositive or collaterally estops
a consideration of all of the other evidence, it is significant to point out that the habeas court made
this finding before the United States Supreme Court decided Penry. This finding, therefore, was not
essential to the habeas court's determinations in the 1988 habeas proceeding, and the State did not
need to fully and fairly adjudicate the issue of applicant's mental retardation at this time. Cf. Ex
parte Watkins, 73 S.W.3d 264, 267 (Tex.Cr.App. 2002) (collateral estoppel bars relitigation of
"specific and discrete facts that have been fully and fairly adjudicated"); Johnston v. American
Medical International, 36 S.W.3d 572, 576 (Tex.App.-Tyler 2000, no writ) (collateral estoppel bars
relitigation of facts that were fully and fairly adjudicated and essential to the judgment in the first
action). For these reasons, this Court's 1992 opinion granting applicant habeas corpus relief also is
not dispositive of whether applicant is mentally retarded.

 That the issue of applicant's mental retardation was not essential to the habeas court's
determinations in the 1988 habeas proceeding is underscored by the habeas court's recommendation
to deny habeas corpus relief despite its finding that applicant is "mildly" mentally retarded. The
issue of applicant's mental retardation was not fully and fairly adjudicated until applicant's 1992
retrial. There the State litigated this issue with its own expert who is the only psychologist to express
an opinion on applicant's mental retardation based on the AAMR and the Section 591.003(13)
definitions of mental retardation that this Court adopted in Briseno.

 What this case really boils down to is whether this Court should stand in the way of the
bargain the parties made in this habeas proceeding. At this point in the judicial process of this 20-year-old case, I do not believe that this Court has (or should exercise) the power to effectuate this
bargain through the vehicle of a mental retardation claim which the record does not support. Just
as executing a truly mentally retarded person would not advance any "evolving standards of decency
that mark the progress of a maturing society," allowing the parties to use a mental retardation claim
not supported by the record as a bargaining chip to dispose of this case would not advance any
evolving standards of decency either. See Atkins, 122 S.Ct. at 2247. On the contrary, effectuating
this bargain based on an unsubstantiated mental retardation claim would promote a sort of
"devolving standard of decency" that marks a society indifferent to the dignity of the victim whom
applicant so brutally murdered. Cf. Atkins, 122 S.Ct. at 2247 (basic concept underlying Eighth
Amendment jurisprudence "is nothing less than the dignity of man"). (17)

 I respectfully dissent. 

 

 Hervey, J.

 

Filed: April 21, 2004

Publish




APPENDIX

 


 
1. Some of the other evidentiary factors adopted in Briseno, slip op. at 12, include:


 Did those who knew the person best during the developmental stage-his family,
friends, teachers, employers, authorities-think he was mentally retarded at that time,
and, if so, act in accordance with that determination?


 Does his conduct show leadership or does it show that he is led around by others?


 Is his conduct in response to external stimuli rational and appropriate, regardless
of whether it is socially acceptable?


 Does he respond coherently, rationally, and on point to oral or written questions
or do his responses wander from subject to subject?


 Can the person hide facts or lie effectively in his own or others' interests?


 Putting aside any heinousness or gruesomeness surrounding the capital murder, did
the commission of that offense require forethought, planning and complex execution
or purpose? 
2. This testimony is not mentioned in either the habeas court's findings or this Court's opinion
granting applicant habeas corpus relief on his mental retardation claim.
3. See Briseno, slip op. at 6 (Holcomb, J., dissenting) (persons like applicant "have the right to
a jury determination on the issue of mental retardation").
4. It could be argued that this Court should accept the parties' agreed finding and that the only
evidence that this Court should consider is Kartye's 1985, Brownlee's 1988, and Clark's 1992
psychological evaluations of applicant. Briseno, however, says that the mental retardation
determination must be based "upon all of the evidence." See Briseno, slip op. at 12. And, here the
agreed finding ignores other overwhelming evidence that applicant is not mentally retarded. 
5. See Briseno, slip op. at 8 citing John Steinbeck, Of Mice And Men (1937).
6. The Court's opinion and the habeas court's findings incorrectly claim otherwise. See
Modden, slip op. at 6 (stating that "Kartye concluded that the applicant is mildly mentally retarded").
7. Kartye did testify, consistent with his 1985 report, that applicant's overall score on the
Wechsler Adult Intelligence Scale was 64 which is 5 points higher than Atkins' overall score of 59. 
See Atkins, 122 S.Ct. at 2245.
8. The Court's opinion states that it is common knowledge that the prisons are full of "writ
writers." This may be so but it does not prove that a writ writer prepared applicant's brief for him.
9. See Penry v. Lynaugh, 109 S.Ct. 2934, 2947-49 (1989).
10. Clark's 1992 evaluation of applicant indicates that applicant's overall score on the Wechsler
Adult Intelligence Scale had dropped from 64 in 1985 to 58 in 1992 which is 1 point less than
Atkins' overall score of 59. See Atkins, 122 S.Ct. at 2245
11. See Briseno, slip op. at 12 (one evidentiary factor is whether the person's response to external
stimuli is "rational and appropriate, regardless of whether it is socially acceptable").
12. See generally Briseno, slip op. at 12.
13. This coherent testimony covers 221 pages in the reporter's record and is attached as an
appendix to this opinion. See Atkins, 122 S.Ct. at 2244 (noting that the trial testimony of Atkins'
accomplice was "more coherent and credible" than Atkins' trial testimony). This testimony was
introduced at applicant's 1992 retrial. Applicant did not testify at his 1992 retrial.

 In his direct appeal from his 1992 capital murder conviction, applicant claimed (in grounds
14 and 15) that his lawyer from his 1985 trial was ineffective for permitting applicant to testify at
the 1985 trial apparently because this testimony seriously undermined applicant's mental retardation
claim at his 1992 retrial. In his brief, applicant argued that his "[1985] trial testimony was inherently
damaging to [applicant], and when considering the expert testimony referred to in another ground
of error, the decision by [applicant's lawyer from the 1985 trial] cannot be viewed in the context of
strategy." This Court rejected this claim on direct appeal. See Moddon v. State, slip op. at 13-15
(Tex.Cr.App. No. 71,493, delivered June 8, 1994) (nonpublished).
14. The State commented on this during closing jury arguments at applicant's 1992 retrial:


 But I ask you to do this: When you think about the issue of intoxication, look at the
actions of the Defendant and see what makes sense. Look at how he was able to
remember how many times he stabbed her. Remember how he was able to pause and
watch when the police car drove by. Remember how he was able to burn his shirt. 
Remember how he was brought in and questioned by the police officers, and
remember how he was able to artfully dodge their questions such that he was not
caught until some months later.
15. This finding actually states that applicant is "mildly mentally retarded."
16. Ex parte Modden, slip op. at 2 (Tex.Cr.App. No. 71,312, delivered February 12, 1992).
17. To effectuate their bargain, the parties may have the remedy of seeking executive clemency
for applicant conditioned upon applicant fulfilling his part of the bargain.