

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00478-CR

———————————————

Ex parte Cedric Richardson

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1503620D

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

Keondrick Polk shot Breon Robinson twice on January 16, 2017. *See Polk v. State*, No. 01-18-00450-CR, 2019 WL 1442180, at *1 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, pet. ref'd) (mem. op., not designated for publication). Appellant Cedric Richardson was present at both shootings that evening, the second of which occurred as Robinson's companion, Jkeiston Levi, tried to drive him to the hospital. *See id.* at *1–2.

During the second encounter, a little over a mile from the location of the first encounter, Levi was also shot several times—in the arm, neck, face, hand, and chest[1]—and a police officer responding to the report of gunfire found him bleeding and unconscious, slumped over his vehicle's central console. *Id.* Robinson was pronounced dead at the scene,[2] but Levi recovered and identified Polk as the shooter.

---

[1]A police officer who responded to the scene testified that Levi had been bleeding from a chest wound and that his thumb was so severely damaged that it was "just hanging off of his hand." One of the responding paramedics said that Levi's chest wound had been life-threatening, that Levi had suffered from "multiple penetrating injuries," and that Levi's blood pressure had been 84/50. Levi endured multiple surgeries, and after a month of physical therapy, he was able to move his hand again.

[2]Robinson was shot three times that evening; two of those shots were fatal. A close-range shot through his back, which exited through his chest, would have required a heart transplant to save his life. The second fatal gunshot hit the back of his head; there was no exit wound because the bullet lodged into his brain. Robinson was also shot in the right thigh.

*Id.* at \*2, \*3. Polk and Richardson were tried separately for Robinson's capital murder, and a jury convicted Polk, *id.* at \*1, but acquitted Richardson as a party to the offense.

After Richardson was charged in a separate indictment as an accomplice with regard to the aggravated robbery and aggravated assault of Levi, he filed a pretrial writ of habeas corpus based on collateral estoppel.[3] Following a hearing, the trial court granted the requested relief as to the aggravated robbery charge but denied it as to the aggravated assault charge.

In a single issue, Richardson appeals the trial court's partial denial of relief, arguing that the State is collaterally estopped from relitigating in a second trial an issue that a jury had already determined, i.e., that he was not a party to the shootings. We agree, reverse the trial court's order denying the remainder of his habeas application, and remand the case to the trial court.

---

[3] *See Ex parte Watkins*, 73 S.W.3d 264, 273 (Tex. Crim. App. 2002) ("[A] claim of collateral estoppel which is based upon constitutional double jeopardy principles is cognizable on a pretrial writ of habeas corpus, as is any double jeopardy claim."). A collateral estoppel claim is based on double jeopardy principles when the State could join two offenses that arise from a single transaction but declines to do so, and a final verdict or specific factual finding favorable to the defendant in the first prosecution would bar relitigation of the same fact in a second proceeding. *Id.*

## II. Background

Levi had known Richardson since they were in middle school together, but "[t]here was a gap" in their relationship when they went to different high schools. They had reconnected through Facebook when Richardson contacted Levi a few weeks before the shooting. As for Robinson, Levi had known him for only three years but characterized their relationship as "close." According to Levi, he and Robinson were together "every day," and he "loved him like a brother."

To Levi's knowledge, Richardson and Robinson had never had any problems with each other. As for Polk, Levi had never met or heard of him before the shooting on January 16, 2017.

On January 16, Richardson called Levi to ask if he wanted to buy a Taurus .40-caliber pistol that Richardson and Polk had come into possession of. After Levi relayed the offer to Robinson, they decided to meet Richardson at a gas station to buy the gun for $200. However, before meeting Levi and Robinson at the gas station later that day, Richardson and Polk sold the gun to someone else.

Robinson carried a gun—a Glock 19 that he had bought off the street—with him to the meeting, and, according to Levi it was not uncommon for Robinson to be armed. Levi explained that Robinson frequently carried a gun for protection "[b]ecause he had beef with different people" and trusted no one. Levi claimed, however, that he had never seen Robinson pull his gun on anyone, and he denied that

4

he and Robinson had planned to rob Richardson and Polk. Levi was unarmed that evening because he was on probation for theft of a motor vehicle.[4]

Levi and Robinson arrived at the gas station first, and while they waited at the gas pump, they smoked some marijuana. When Polk and Richardson arrived, Polk parked his silver Volkswagon Jetta in front of the store,[5] got out, went around to the side of the store, spoke briefly with someone, and then returned to the Jetta. Richardson then handed Polk a gun,[6] and Polk put it in his front waistband before they walked over to Levi's vehicle and got into the back seat.

Levi occupied the driver's seat, and Robinson was seated in the front passenger's seat. Polk sat behind Levi, and Richardson sat behind Robinson. Richardson left the back passenger door ajar, and his right leg remained outside of the vehicle.

When Polk and Richardson got into the vehicle, Robinson was holding his Glock—which had an extended clip containing 30 rounds—on his lap while Levi held

---

[4]Levi did not want to be caught as a felon in possession of a firearm. *See* Tex. Penal Code Ann. § 46.04.

[5]Police collected video from the gas station surveillance cameras. The gas station surveillance videos showed the Jetta's license place and led police to its owner, Polk's mother, the day after the shooting.

[6]Two detectives testified that, regarding the gas station surveillance video, they believed that the object that Richardson handed to Polk was a firearm, and during closing argument, defense counsel conceded that Richardson had handed a gun to Polk.

the money to buy the Taurus. Levi said that Robinson had his gun out because he had "felt like they w[ere] going to rob us."[7] But, according to Levi, Robinson did not point the gun at Polk or Richardson.

Levi testified that almost immediately after entering the vehicle, Polk demanded, "Give me y'all['s] s---." Levi said he threw the money he was holding at Polk, who then shot Robinson in the back: "I dug in my pocket, just threw the money back like that (motioning), with my hands up, and all of a sudden, bam." Levi recounted that after Polk shot Robinson, Richardson reacted by saying, "[W]hat the f---, what the f---?"

Levi said that after the shot rang out, he, Robinson, and Richardson fled the vehicle. Robinson dropped the Glock as he was running.[8] Polk, however, did not immediately run away but instead briefly entered the driver's seat before leaving the vehicle. According to Levi, Polk then picked up the Glock that Robinson had dropped and continued walking in the direction that Robinson and Levi had taken.

---

[7]Detective Kyle Sullivan said that Levi initially told him that he did not know that Robinson had a gun.

[8]A trace evidence examiner from the Tarrant County Medical Examiner's Office performed gunshot residue analysis from samples taken from Robinson's hands but said that she could not say whether he had fired a gun because the residue found on him was also consistent with being in a confined space (Levi's vehicle) when a gun was fired.

Richardson also returned to Levi's vehicle and leaned inside the back seat.[9] Levi said that he did not know what Richardson went back to get. Richardson then went back to the Jetta and, at Polk's instruction, drove it in the direction that Robinson and Levi had gone.

Levi cried out for someone to call 911 but when no one did so, he ran back to his car and retrieved his phone.[10] He then moved his car closer to where Robinson's body was lying. At that point, Polk helped him pick Robinson up and put him in the back seat.[11] Levi said that Polk told him, "[L]et me help you, fool," and that Richardson told him to follow them to the hospital.

Because Levi did not know how to get to the hospital from the gas station, he had followed Richardson and Polk, thinking that they were trying to help him get there. But then the Jetta slowed down. Levi had called 911 while driving, but during the call, his phone went dead when Polk shot him from the Jetta, first in his left arm, which was on the steering wheel, and then in the face and the neck.

This second shooting incident occurred in a residential neighborhood about a mile and a half away from the gas station. After the shots were fired, Levi's vehicle

---

[9]Detective Sullivan agreed on cross-examination that he could not tell if Richardson had retrieved anything from the back seat, but "based on common sense," the detective assumed that he had.

[10]Levi's phone showed that he made calls to 911 at 7:14 p.m. and 7:17 p.m.

[11]Robinson left a pool of blood at the northeast corner of the gas station.

came to a halt over the sidewalk and into a portion of a lawn and retaining wall.[12]

Officers found Robinson face-down, sprawled across the back seat and floorboard and showing no signs of life; they saw that Levi was bleeding and struggling to breathe, called for an ambulance, and administered first aid to Levi.

Four 9-millimeter Luger Barnes +P casings, all fired from the same gun, were recovered from the scene, "up and down the roadway . . . within a couple of car lengths" of Levi's vehicle. A few days later, after obtaining a search warrant, police secured and searched both Levi's vehicle and the Jetta. They found no weapons or money, but Levi's vehicle contained a bullet that had been shot from inside the vehicle and that was lodged inside the driver's side door. The back of the front passenger seat likewise had bullet hole, and a bullet casing for a 9-millimeter Luger was found on the floorboard behind the front passenger seat. Another bullet was found in the front passenger door. No projectiles were found inside the Jetta, but a casing for a .9 millimeter Luger was found on the driver's side floorboard.

---

[12]One of the responding officers described the vehicle as set at a 45-degree angle over the curb, in contact with a mailbox, and facing the wrong side of the road. The prosecutor asked the officer to explain the term "pit maneuver," which he stated was "pulling up behind a vehicle on its side and using your vehicle to impact that vehicle . . . to cause it to spin out, to make it lose control, to box it in," so that it could be stopped and immobilized. On cross-examination, the officer agreed that in previous testimony (Polk's capital murder trial) he had never talked about a pit maneuver.

Levi said that Polk had used Robinson's Glock and another gun (which he identified as the Taurus they had gone to purchase)[13] to shoot him while Richardson was driving. Having been shot, Levi had passed out, wrecked his car, and woke up in an ambulance. He did not remember anything from that point until detectives came to talk with him at the hospital. At the hospital, Levi identified Polk as the shooter from a photo lineup, and although he had also identified Richardson from a photo lineup, he told police that Richardson had just been there, explaining that Richardson was "not down for that type of stuff."

The first count of Richardson's indictment in the first trial alleged that he had intentionally caused Robinson's death by shooting him with a firearm while in the course of committing or attempting to commit the offense of robbery. The second count alleged that Richardson had intentionally committed an act clearly dangerous to human life—shooting Robinson with a deadly weapon—with the intent to cause serious bodily injury to Robinson and causing his death. At the conclusion of the trial, the jury was also instructed to consider the lesser-included offense of aggravated robbery with a deadly weapon if they did not find Richardson guilty of capital murder. The jury acquitted Richardson.

_____

[13]A forensic scientist called this identification into question, testifying that two 9-millimeter Luger PMC-brand bullet casings were fired from a different weapon, a Hi-Point pistol, and that a Taurus-type firearm could not have generated or produced any of the items he reviewed.

9

Count two[14] of Richardson's indictment in the instant case alleges that he intentionally or knowingly caused bodily injury to Levi by shooting him with a firearm and used or exhibited a deadly weapon (firearm) during the commission of the assault. At the hearing on Richardson's habeas application, the State argued that there were geographic and temporal gaps between the first and second shootings that day, preventing collateral estoppel from barring the prosecution as to Levi.

## III. Discussion

The doctrine of collateral estoppel is embodied in the Double Jeopardy Clause of the Fifth Amendment, which provides that no person shall be "subject to the same offense to be twice put in jeopardy of life or limb." *Ex parte Adams*, 586 S.W.3d 1, 2, 4 (Tex. Crim. App. 2019) (quoting U.S. Const. amend. V). Under the collateral estoppel component of double jeopardy, the government may not litigate a specific elemental fact to a competent factfinder (judge or jury), receive an adverse finding by the factfinder on the specific fact, learn from its mistakes, hone its prosecutorial performance, and relitigate that same factual element that the original factfinder had already decided against the government. *Id.* at 5 (quoting *Rollerson v. State*, 227 S.W.3d 718, 730 (Tex. Crim. App. 2007)); *Murphy v. State*, 239 S.W.3d 791, 794 (Tex. Crim. App. 2007) ("While double jeopardy protects a defendant against a subsequent prosecution for an offense for which the defendant has been acquitted, collateral

---

[14]Because the trial court granted Richardson's request to dismiss count one, aggravated robbery, we do not include it in our discussion.

10

estoppel deals only with relitigation of specific fact determinations."); *Watkins*, 73 S.W.3d at 267 ("Double jeopardy bars any retrial of a criminal offense, while collateral estoppel bars any retrial of specific and discrete facts that have been fully and fairly adjudicated.").

The application of collateral estoppel is a question of law for which de novo review is appropriate. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Ex parte Lorence*, No. 02-20-00004-CR, 2020 WL 5242435, at *8 (Tex. App.—Fort Worth Sept. 3, 2020, no pet.) (mem. op., not designated for publication).

## A. Collateral Estoppel Test

To determine whether collateral estoppel applies, we must ask what facts were "necessarily decided" by the first factfinder, how broad in scope—in terms of time, space, and content—the findings were, and whether they constitute facts essential to a conviction in the second trial. *Adams*, 586 S.W.3d at 5. Before collateral estoppel will apply to bar the relitigation of a discrete fact, that fact must necessarily have been decided in favor of the defendant in the first trial. *Id.* (quoting *Watkins*, 73 S.W.3d at 268); *Murphy*, 239 S.W.3d at 795 ("The first prong is fairly simple; the particular fact litigated in the first prosecution, in which a final judgment was entered, must be the exact fact at issue in the second prosecution."). The court of criminal appeals has noted that "there are no hard and fast rules concerning which factual issues are legally identical and thus barred from relitigation in a second criminal proceeding," noting that a commentator has observed that "[i]f an ordinary person would expostulate, 'But

11

that's a different issue,' probably it is." *Ex parte Taylor*, 101 S.W.3d 434, 442 (Tex. Crim. App. 2002).

As instructed by the court of criminal appeals, we begin our analysis with the jury instructions from the first trial. *Adams*, 586 S.W.3d at 6 ("In determining which facts were necessarily determined by the jury, the natural place to begin is the jury's instructions from the first trial."). Then we review the evidence from the first trial to determine the rationally conceivable issue or issues in dispute before the jury. *Id.* at 7; *see Murphy*, 239 S.W.3d at 795 ("[A] court must determine (1) exactly what facts were necessarily decided in the first proceeding, and (2) whether those 'necessarily decided' facts constitute essential elements of the offense in the second trial."); *see also Ashe v. Swenson*, 397 U.S. 436, 444, 90 S. Ct. 1189, 1194 (1970) (stating that when a previous judgment of acquittal is based on a general verdict, the court must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration");[15] *Watkins*, 73 S.W.3d at 268–69 (stating that a court must review the

---

[15]In *Ashe*, three or four masked and armed men robbed six poker players and then fled together. 397 U.S. at 437, 90 S. Ct. at 1191. Ashe was tried for robbing Knight, one of the six poker players, but was found "not guilty due to insufficient evidence." *Id.* at 439, 90 S. Ct. at 1192. Six weeks later, Ashe was tried for robbing Roberts, another one of the poker players, after the trial court denied his motion to dismiss based on the previous acquittal. *Id.*, 90 S. Ct. at 1192. The witnesses in the Roberts trial were "for the most part the same, though this time their testimony was

entire trial record, "as well as the pleadings, the charge, and the arguments of the attorneys, to determine 'with realism and rationality' precisely which facts the jury *necessarily* decided and whether the scope of its findings regarding specific historical facts bars relitigation of those same facts in a second criminal trial"); *Taylor*, 101 S.W.3d at 439 n.9 (noting that cases involving collateral estoppel are "not susceptible to bright-letter law or black-letter law; the areas are most often gray and dimly to be

---

substantially stronger on the issue of [Ashe's] identity," and the jury found Ashe guilty. *Id.* at 439–40, 90 S. Ct. at 1192.

The Supreme Court made clear that as to collateral estoppel of the issue of Ashe's identity as a participant in the robbery,

> [t]he question is not whether Missouri could validly charge the petitioner with six separate offenses for the robbery of the six poker players. It is not whether he could have received a total of six punishments if he had been convicted in a single trial of robbing the six victims. It is simply whether, after a jury determined by its verdict that the petitioner was not one of the robbers, the State could constitutionally hale him before a new jury to litigate that issue again.
>
> After the first jury had acquitted the petitioner of robbing Knight, Missouri could certainly not have brought him to trial again upon that charge. Once a jury had determined upon conflicting testimony that there was at least a reasonable doubt that the petitioner was one of the robbers, the State could not present the same or different identification evidence in a second prosecution for the robbery of Knight in the hope that a different jury might find that evidence more convincing. The situation is constitutionally no different here, even though the second trial related to another victim of the same robbery. For the name of the victim, in the circumstances of this case, had no bearing whatever upon the issue of whether the petitioner was one of the robbers.

*Id.* at 446, 90 S. Ct. at 1195–96.

13

seen" (quoting *United States v. Larkin*, 605 F.2d 1360, 1361 (5th Cir. 1979), *modified on other grounds*, 611 F.2d 585 (5th Cir. 1980)).

In *Adams*, the court of criminal appeals demonstrated how to perform this analysis. Adams, the habeas applicant, had stabbed two brothers—Justin and Joe—in the same incident. 586 S.W.3d at 2–3. After Adams was acquitted of stabbing Justin, he argued that collateral estoppel prevented his prosecution for stabbing Joe. *Id.* In the first trial, the jury was charged on aggravated assault by use of a deadly weapon, aggravated assault by causing serious bodily injury, and Adams's justification defense, and the record of that case reflected that Adams did not contest whether the State proved aggravated assault and did not deny during his testimony that an assault occurred. *Id.* at 6–7. Further, the evidence was amply sufficient to prove aggravated assault when Justin's hospital records confirmed that Justin had to have surgery to repair a collapsed lung and treat his "sucking chest wound," which could have been fatal. *Id.* Instead, the trial's focus was on Adams's justification defense, which the court concluded was the only issue upon which the jury could have acquitted him. *Id.* at 7–8.

The defensive issue that was submitted to the jury instructed it to determine whether the State had proved (1) that Adams did not believe his conduct was immediately necessary to protect Luke Hisey against *Justin*'s use or attempted use of unlawful deadly force; (2) that Adams's belief was not reasonable; or (3) that under the circumstances as Adams believed them to be, Adams would not have been

14

permitted to use force or deadly force to protect himself against the unlawful force or unlawful deadly force with which Adams reasonably believed *Justin* was threatening Luke Hisey. *Id.* at 6, 8. "The issue submitted to the jury did not ask the jury to determine whether [Adams] was justified in his use of force against *Joe.*" *Id.* at 8 (emphasis added). Because the jury's determination in favor of Adams on the defensive issue as to Justin did not mean that the jury "necessarily decided" that Adams was justified in using force against Joe, the court held that the State was not barred from litigating the issue in trying Adams for the aggravated assault of Joe. *Id.*; *see also Ex parte Desormeaux*, 353 S.W.3d 897, 902–03 (Tex. App.—Beaumont 2011, pet. ref'd) (holding that collateral estoppel did not bar stepmother's subsequent prosecution for injury to a child because the question of whether her failure to seek medical treatment had resulted in an injury was not answered in the first trial, which was on capital murder and focused on whether she had intentionally or knowingly committed an act that caused the child's death by choking him, shaking him, or striking his head on an object).

## B. Application

### 1. Jury Charge in the First Trial

The charge in Richardson's first trial set out the elements of capital murder, murder, aggravated robbery with a deadly weapon, aggravated robbery, and theft. It also set out an instruction on the law of parties, stating,

15

All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

Each party to an offense may be charged with commission of the offense.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Mere presence alone will not constitute one a party to an offense.*

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. [Emphasis added.]

In the application portion of the charge, the jury was asked to decide whether Richardson, "acting either alone or as a party," had, pursuant to count one of the indictment, intentionally caused Robinson's death by shooting him with a firearm while committing or attempting to commit the offense of robbery (capital murder). If the jury acquitted Richardson of capital murder, then they were instructed to consider whether, "acting either alone or as a party," Richardson had intentionally or knowingly, while committing theft of property, caused bodily injury to Robinson by shooting him with a firearm or threatened or placed Robinson in fear of imminent bodily injury or death and used or exhibited a deadly weapon (aggravated robbery with a deadly weapon).

16

If the jury acquitted Richardson as to count one, it was instructed to consider count two, which asked it to decide whether Richardson, "acting either alone or as a party," had intentionally or knowingly caused Robinson's death by shooting him with a deadly weapon or by intentionally, with intent to cause serious bodily injury to Robinson, committed an act clearly dangerous to human life by shooting him with a deadly weapon and causing his death (murder). The jury found Richardson not guilty of count one (capital murder; aggravated robbery) and not guilty of count two (murder by shooting with a deadly weapon).

### 2. Voir Dire in the First Trial

During voir dire, the prosecutor went over the elements of capital murder, murder, and aggravated robbery as set forth in the indictment and then addressed the law of parties and how mere presence alone is insufficient to make a person into an accomplice. Defense counsel also addressed the law of parties and mere presence and posed a variety of hypothetical situations to test the potential jurors.[16]

### 3. Opening Statements in the First Trial

During his opening statement, the prosecutor told the jury that Robinson and Levi were best friends who decided to buy a gun from Richardson and asked the jurors to remember the law of parties when watching the video of what happened

---

[16]For example, defense counsel asked the jury to consider the following scenario: "[I]f I'm taking you to get toilet paper and you go in and you rob and kill the clerk, I'm not guilty of capital murder, because I'm not in a conspiracy with you to commit the robbery. Does that make sense?"

when they went to a gas station to conduct the transaction and immediately afterwards. He also told them that Richardson was driving when Polk shot at Levi, the "living witness" to Polk's shooting Robinson.

Richardson's counsel responded that the State was relying on Levi and the gas station videotape and that the evidence would show that Richardson and Levi had been friends since they were kids. She stated, among other things, that the video would show that Polk and Richardson pulled up right in front of the gas station store and did not cover their faces and that the evidence would show that Richardson, who was merely present and "could not have anticipated what was going to happen," was surprised and horrified when Polk started shooting at Levi.

### 4. Salient Evidence in the First Trial

As set out above in our factual recitation, the evidence showed that Richardson had arranged to sell a gun to Levi for $200 and handed a gun to Polk before they got into Levi's vehicle. Robinson, who had planned to acquire a gun, was armed with a Glock. Polk shot him in the back and, after everyone fled the vehicle, Polk took the Glock and the purchase money. Levi—the only testifying witness to both shootings—described Richardson, whom he had known for longer than any of the others, as having been profoundly surprised by Polk's shooting Robinson, and he described Richardson as just having been there, i.e., merely present. Levi also identified Polk as the perpetrator of the second round of shooting, which left him grievously injured.

18

### 5. Closing Arguments in the First Trial

During closing arguments, the prosecutor explained that aggravated robbery was a lesser-included offense of capital murder (shooting Robinson in the course of committing robbery), and that the only way the jury would get to murder is if it did not believe the robbery happened, "and we know that happened." The prosecutor argued that robbery happened when the money Levi threw in the air was stolen and Robinson's gun was stolen, and "[t]hen we have all the activity that occurs on the way to the second scene." He further argued that there was no Taurus gun to sell so Polk and Richardson went to the gas station to rob Levi and Robinson, a conspiracy to commit aggravated robbery, and "[s]urprise, surprise, a murder breaks out. Not a surprise."

The prosecutor argued that Richardson had been ready to flee by not closing the car door all the way when he and Polk settled into the backseat of Levi's vehicle before Polk fired the gun and that the jury could reasonably infer from Polk's actions on the video that he was "picking up the money, that he's trying to start [Levi's] car at the steering wheel." He also pointed out that Richardson went back to Levi's vehicle before going to get Polk's vehicle. And then he addressed the second shooting, arguing

> How many more times could [Levi] have been shot? It was by the grace of God, by God that [Levi] wasn't killed. Shot in the arm as he was driving. Then shot in the jaw and a bullet recovered. Shot in the neck and then shot in the right hand as well. But you can hear that . . . on the 9-1-1 call.

19

. . . . [Richardson and Polk], they had all the mal intent they could muster that day, because they weren't going to let just [Robinson] be the only dead body. They didn't want a living witness in [Levi] either, and they tried so hard to finish that hunt off.

Defense counsel then reminded the jury that the State was prosecuting Richardson, not Polk, and that the State's "game plan is to make Polk look to be a bad guy, because we know birds of a feather, right?" He argued that Richardson's only act with regard to Robinson's murder was handing Polk a gun. He argued that Richardson did not have a self-defense claim because he had not done anything, although Polk might have had such a claim, because he was the shooter. He pointed out,

> You can look through this Charge till you're blue in the face. You are never going to see Jkeiston Levi's name in that Charge. Ever. Y'all are not here to answer the question did Keoddrick Polk or did Cedric Richardson commit a crime against Jkeiston Levi? You will not be asked that question. There's no place for you to sign your name, whoever the foreman is, to say that Jkeiston Levi was a victim. Your job is to answer whether or not Cedric Richardson is guilty of capital murder because of what Keoddrick Polk did.

He asked the jury, "What in and of itself can you glean any type of culpability on Cedric Richardson's part simply by handing a gun?" when Levi testified that Richardson was "just there."

The other defense counsel likewise reiterated to the jury that its job was to determine whether Richardson was a party to helping Polk shoot and kill Robinson during the course of a robbery and that "whether Jkeiston Levi is a victim of any kind

20

of crime . . . is a separate indictment for a different jury on a different day." She asked them to decide when Richardson handed Polk a gun, "was he aiding him in committing a robbery, or was he aiding him in selling a gun?" And she told them that Richardson would not have reacted as Levi described—all the "what the f---[s]"—if Richardson could have anticipated that Polk would shoot Robinson.

In rebuttal, the prosecutor responded that the jury knew there was a robbery because Robinson and Levi went there with money and "you see in the video, you see them picking something up . . . [t]hat's robbery one way when they took that money." The prosecutor said that it was also robbery "whenever they run over and they grab that gun from [Robinson]," because Robinson carried a Glock, and "the ballistics in this case are consistent with a Glock being fired . . . [and] with two guns being used." She argued, "This is so much more than [Richardson's] handing a gun." The prosecutor pointed out that the Taurus gun that Richardson had offered to sell that day had already been sold to someone else before Richardson and Polk went to the gas station to meet Levi and Robinson and take the $200. The prosecutor argued that Richardson had set up the robbery and that his actions showed that he was aiding and encouraging Polk, and she argued that after Levi was shot, Richardson "left his friend to die." She asserted that Richardson "was in from the beginning. He is dangerous. He was in from whatever happened after he set that robbery up."

The jury deliberated for 6 hours that day after closing arguments and then for another full day before acquitting Richardson of the capital murder, aggravated robbery, and murder of Robinson.

**6. Analysis**

In the Robinson case, the second count in Richardson's murder indictment alleged that Richardson had intentionally committed an act clearly dangerous to human life—shooting Robinson with a deadly weapon—with the intent to cause serious bodily injury to Robinson and causing his death. The jury acquitted him of this charge. Because Robinson received fatal gunshot wounds during both shootings, to acquit, the jury must have found that Richardson was neither a shooter nor a party to either of the shootings.

In the instant case, count two[17] of Richardson's indictment—the aggravated assault count—alleges that he intentionally or knowingly caused bodily injury to Levi by shooting him with a firearm and used or exhibited a deadly weapon (firearm) during the commission of the assault. To convict on this count, the jury would have to find that Richardson was a party to the second shooting.

Given the pleadings, the jury charge, the disputed issues, and the evidence presented at trial, the jury in the first trial necessarily decided that Richardson was not a shooter and that he had been merely present rather than an accomplice to Polk's

---

[17]As we noted in our factual recitation above, the trial court granted Richardson's request to dismiss count one, aggravated robbery.

22

acting as the shooter. *See* Tex. Penal Code Ann. §§ 19.02(b)(1)–(2), 22.01(a)(1), 22.02(a)(2). Because the jury had already acquitted Richardson of murder *by shooting* with the requisite mental state, either as the actual shooter or as a party, the question of whether Richardson was the shooter was decided in the first trial. Accordingly, the trial court erred by denying Richardson's request to dismiss the aggravated assault charge.[18] We sustain Richardson's sole issue.

## IV. Conclusion

Having sustained Richardson's sole issue, we reverse the trial court's order denying the remainder of his requested relief and remand the case to the trial court with instructions to enter an order granting the relief requested in Richardson's application for writ of habeas corpus.

---

[18]This case represents the inverse of *Adams*, which revolved around the applicability of a defense when there was no question about whether the habeas applicant had stabbed both complainants (he had). Here, in the first trial, the jury found that Richardson had not killed Robinson by shooting him (or as an accomplice to shooting him), so the question of whether he had also injured Levi by shooting him during the course of the same transaction had already been decided—the jury had determined that he was merely present during the shootings, and the State is not allowed to relitigate that determination. *See, e.g.*, *Rollerson*, 227 S.W.3d at 730 (noting that the use of a deadly weapon can be an "ultimate issue" subject to collateral estoppel principles: "If a factfinder determines that a defendant did not use a deadly weapon, the State cannot contest the jury's finding of that fact in a subsequent proceeding."); *Ex parte Taylor*, 101 S.W.3d at 436 (holding collateral estoppel applied to the ultimate issue of general intoxication when defendant's two passengers died and a jury acquitted him of intoxication manslaughter as to one passenger regarding intoxication by alcohol and the State sought to prosecute him for intoxication manslaughter as to the other passenger regarding intoxication by alcohol and marijuana or by marijuana alone).

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  March 25, 2021